[759 NYS2d 470]

In the Matter of ROBERT MASON et al., Petitioners, v DEPARTMENT OF BUILDINGS OF THE CITY OF NEW YORK et al., Respondents.

First Department, May 22, 2003

## APPEARANCES OF COUNSEL

*Jeffrey S. Ween* of counsel (*Jeffrey S. Ween & Associates*, attorneys), for petitioners.

*Ronald E. Sternberg* of counsel (*Leonard Koerner* on the brief; *Michael A. Cardozo, Corporation Counsel*, New York City, attorney), for municipal respondents.

*Richard L. Claman* of counsel (*Stempel Bennett Claman & Hochberg, P.C.*, attorneys), for 12/12 Realty Associates, respondent.

## OPINION OF THE COURT

Toм, J.P.

Resolution of this case turns on how we apply the term "home occupation" insofar as it is defined in the New York City Zoning Resolution. As will be discussed below, the Zoning Resolution allows for certain narrowly defined nonconforming uses, for residential premises, denoted "home occupations," which are incidental to the residential use, as a reflection of economic and demographic trends in the 1970s and early 1980s and to achieve certain policy goals. The New York City ordinance must be analyzed in the context of related provisions of the New York State Multiple Dwelling Law.

Petitioner contends that the use of a significant portion of his residential premises by nonresident musicians as a recording studio is a home occupation, a construction of the term which is opposed by respondent New York City Department of Buildings (DOB). For reasons set forth below, we agreé with the DOB and reject petitioner's overly broad construction of the term "home occupation," insofar as it conflicts with the plain meaning of the ordinance and also is contrary to the broader legislative goals which this exemption was intended to achieve.

The individual petitioner and his wholly owned corporation, petitioner RPM Electronic Sound Studios, Inc., occupy the 11th

floor of 12 East 12th Street in New York County. The subject unit is a former loft. Mason has resided in the premises since 1976, at which time petitioner RPM was the named tenant under a commercial lease allowing for the operation of a sound studio business, "and for no other purpose." Since that time, and coinciding with his residency, petitioner has maintained the fully functioning professional music recording studio in which musicians record their material for a fee payable to the corporate petitioner. Mason is not himself a musician, but allegedly does operate, and provides technical services for, the recording sessions. The commercial lease with present landlord's predecessor in interest expired by its terms in 1984. Respondent 12/12 Realty Associates purchased the building in 1982 and is the present landlord.

Beginning in or about 1983, respondent 12/12 Realty Associates began attempts to convert the apartments into condominiums, and also began seeking certificates of occupancy for the various units in the building, including petitioner's loft unit. Landlord succeeded and all units were converted, with the exception of petitioner's.

In or about 1986, landlord served a notice of default on petitioner, claiming that he had exceeded the permissible use of the premises. This resulted in petitioner bringing a *Yellowstone* action which was resolved in his favor both before the IAS court and this Court (*Mason v 12/12 Realty Assoc.*, 158 AD2d 334 [1990]). In 1991, the parties entered a stipulation to settle this litigation.

Thereafter, landlord continued in its efforts to obtain a certificate of occupancy for the unit. The DOB conducted inspections regarding the application for a certificate of occupancy for the subject unit from 1988 through 1992, when a certificate was granted. None of these inspections found anything but minor violations in the unit, and the DOB never made any challenge to petitioner's practice of renting out the recording studio (although, as discussed below, it is not clear if the DOB was aware of this particular use of the studio).

In September and October 1997, complaints were filed by the landlord with the DOB. The October complaint alleged that petitioner's expansion of the home occupation use to a commercial use was contrary to zoning restrictions and the certificate of occupancy. In this regard, there were two factors to be considered: whether the use was an authorized home occupation; and whether the portion of the premises devoted to such commercial use exceeded the parameters allowed by the

ordinance, which was 49%. The complaint report indicated that an inspection indicated that petitioner was utilizing the premises 50% for residential and 50% for commercial uses, "contrary to CO."

As a result of landlord's complaint, the DOB issued a notice of violation. This notice stated only that petitioner had violated the regulations by having the studio exceed 49% of the square footage of the apartment.

Landlord issued a notice of default under the lease, again in an effort to get petitioner out. Petitioner commenced another *Yellowstone* proceeding and obtained a stay.

In the interim, the hearing on the notice of violation went forward before the DOB. However, soon after the hearing commenced, the DOB abandoned its argument that the studio exceeded the maximum number of square feet allowed. Rather, it urged a new theory: that petitioner's renting out the studio for use by outside musicians violated the "home occupation" regulation. Landlord intervened in the administrative hearing, and fully participated.

The hearing was held in two sessions, one in June 1998 and one in September 1998. At the conclusion of the hearing, the Administrative Law Judge (ALJ) issued a decision finding that: (a) petitioner did engage in the business of renting out the studio to outside musicians; and (b) such use violated the home occupation regulations.

Petitioner appealed to the Environmental Control Board (ECB), which affirmed the findings of the ALJ.

During the interim, petitioner had commenced a declaratory judgment action in New York County Supreme Court. By order dated September 8, 1998, the court (Lebedeff, J.) found that the parties had stipulated to this use, that the certificate of occupancy authorized the challenged use, and that the DOB failed to object to the challenged use upon inspection. Notably, this decision was issued during the still ongoing administrative proceeding and is, in any event, not binding on us.

■ Petitioner then commenced the present CPLR article 78 proceeding, arguing that the finding of DOB and ECB was arbitrary and capricious when viewed in the context of the DOB's purported prior determination that petitioner's longtime and continuing use of the premises for these purposes was valid. Petitioner argued that the ALJ and ECB missed the point that composing music was not his home occupation but, rather, the recording of music, in which he was intimately

involved, was the home occupation. The article 78 court, concluding that this case presented a substantial evidence analysis, transferred the proceeding to us pursuant to CPLR 7804 (g). That section mandates such a transfer where one of the bases for the challenge to administrative action is that the determination was not supported by substantial evidence. Petitioner objects to the transfer, arguing that he never raised a substantial evidence challenge and that his challenge must be reviewed under an arbitrary and capricious standard. Notably, petitioner's counsel conceded before the ALJ that petitioner rented out the studio to others, though he disclaimed knowing how often. The present review does involve interpretation of a legal term rather than a parsing of evidence. Under either standard, though, we would reach the same result under the circumstances of this case: that petitioner's use, as a matter of law, is not a valid home occupation as that term is meant in the Zoning Resolution. We would retain jurisdiction even if the transfer were improper (*Matter of Kent Ave. Block Assn. v New York City Bd. of Stds. & Appeals*, 280 AD2d 423 [2001], *lv denied* 96 NY2d 715 [2001]).

Preliminarily, we reject petitioner's contention that the DOB had previously determined that petitioner's use of the premises as a recording studio was legal and that such a determination must now be given preclusive effect. Petitioner notes that section 645 (b) (3) (d) of the New York City Charter provides that "a certificate of occupancy of a building or structure shall certify that such building or structure conforms to the requirements of all laws, rules, regulations and orders applicable to it * * *." Petitioner also notes that it is undisputed that the DOB conducted pre-certificate of occupancy inspections from 1988 to 1992, and issued the certificate of occupancy in 1992. DOB never found a violation. Therefore, he concludes, the DOB must be deemed to have approved the challenged use, both in not issuing violations and in issuing the certificate of occupancy.

The DOB inspected the premises in connection with the anticipation that a certificate would be issued, but little can be discerned with respect to that inspection regarding the issue raised in the present matter. The inspection presumably verified the layout and size of the unit and possibly the fact of a recording studio, but it is sheer speculation to assume that the inspectors knew that the space, rather than being used by a home musician for his own personal recordings, was being rented to nonoccupants for their commercial recordings. Rather, it appears that such a use of the premises was never

identified to, or considered by, the building inspector when making the report. Although a certificate of occupancy was issued, the certificate did not purport to authorize the challenged use. The certificate of occupancy identified the 11th floor only as containing "1 class A apartment w/ home occupation." Hence, whether or not the certificate of occupancy verifies that petitioner was in compliance with zoning area requirements at the time of the inspection, the certificate of occupancy is silent as to the specific issue of use presently being litigated. Petitioner's reliance on it, therefore, is unavailing.

■ We also reject petitioner's contention that respondents are barred by prior judicial findings that the renting-out use was permissible. The prior judicial determinations never dealt with the issue at hand: does the renting-out use violate the certificate of occupancy and/or the Zoning Resolution on home occupation? In the 1988 litigation, petitioner brought a *Yellowstone* action. In its counterclaims, landlord alleged petitioner had violated the zoning regulations because of, inter alia, the renting-out use. The Court did state, as petitioner notes, that the DOB had conducted an inspection of the premises and found only minor violations, and no violations of the zoning regulations. However, we refused to rule on landlord's counterclaims, stating that they did not present "a current justiciable controversy." In our 1990 decision (*Mason, supra*), we found that, for purposes of the injunctive relief, the 1988 inspection had not revealed violations of the home occupation provisions of the Zoning Resolution such as would impede the landlord in securing a certificate of occupancy. That was the gravamen of the landlord's complaint at the time. Parenthetically, we did not find that the DOB had authorized this use, but found only that for purposes of that case, violations had not been issued. We also expressly stated that the issue of whether any particular use violates the certificate of occupancy must await the issuance of a certificate of occupancy (which was not issued until 1992), and thus our ruling never passed on landlord's contentions on this issue. In so ruling, we explicitly found it to be speculative whether or not the DOB would perceive the activities to be violative of the certificate of occupancy in the future, and noted that we could defer to the DOB insofar as it is the agency with expertise in such matter. We also suggested that if the tenant violated the certificate of occupancy once it was issued, the landlord would be entitled to serve a notice to cure and, in the absence of compliance, then commence a summary proceeding (*Mason, supra*).

The 1998 IAS court decision upon which petitioner relies also arises from a declaratory judgment/*Yellowstone* action brought by petitioner against landlord. In that action, landlord raised as an affirmative defense that the renting-out use violated the certificate of occupancy and/or zoning regulations. The IAS court dismissed those affirmative defenses stating that it "adopted" petitioner's argument as to the conclusiveness of the certificate of occupancy. However, a fuller reading of that decision, and of the case's procedural history, undercuts the value of that statement for petitioner. In that same decision, the IAS court emphasized that absent a finding of a violation by the DOB, the affirmative defense had insufficient support. A fair reading of the decision then is that the IAS court required an actual finding of a violation of either the certificate of occupancy or the zoning regulations by the DOB, before it would hear the affirmative defense of violation from the landlord. It does not appear that the IAS court's first preliminary injunction ruling finally disposed of the issue of whether or not the DOB might find such a violation or whether, if it did, the landlord could use such a violation as a basis to terminate the lease.

■ As to the issue of whether petitioner's renting out of the recording studio is a permissible "home occupation," an analysis of applicable provisions of the zoning regulations and the Multiple Dwelling Law is required.

We have previously noted that the primary task of statutory construction, as applied to the interpretation of the New York City Zoning Resolution and more specifically to the terms employed in section 12-10, is to give effect to the clear intent of the City Council (*City of New York v Stringfellow's of N.Y.*, 253 AD2d 110, 116 [1999], *lv dismissed* 93 NY2d 916 [1999], *appeal after remand* 268 AD2d 216 [2000], *affd* 96 NY2d 51 [2001]). There, albeit in a different context, we noted that the term "customarily" most often appears in connection with home occupations or accessory uses incidental to principal residential uses in zoning ordinances, and we declined to contort the meaning beyond the clear and intended construction. So, too, here, we decline to confer meanings on terms that are obviously inconsistent with the legislative intent. Notably, the definition of "home occupation" is an exemption to zoning norms and as such we construe it narrowly pursuant to the legislative intent. In analyzing the term, although we need not unquestioningly defer to the administrative agency, we will give due consideration to DOB's practical construction of the ordinance

(*Matter of Exxon Corp. v Board of Stds. & Appeals of City of N.Y.*, 128 AD2d 289, 296 [1987], *lv denied* 70 NY2d 614 [1988]).

Zoning Resolution § 12-10 defines "home occupation" as an accessory use which:

"(1) is clearly incidental to or secondary to the residential use of a dwelling unit or rooming unit;

"(2) is carried on within a dwelling unit * * * by one or more occupants * * * except that, in connection with the practice of a profession, one person not residing in such dwelling unit * * * may be employed; and

"(3) occupies not more that 25 percent of the total floor area of such dwelling unit * * * and in no event more than 500 square feet of floor area" (Zoning Resolution § 12-10 [Home occupation] [a]).

In the present C6 District, the square footage restrictions for home occupations are relaxed to permit them to occupy in excess of 500 square feet and up to 49% of the floor area (*see* Zoning Resolution § 15-13 [a]), although there is still the requirement that such use remain accessory to the residential use, along with the additional qualifications. Zoning Resolution § 12-10 sets forth a three-prong test for determining whether a use qualifies as an accessory use; the only test applicable herein is that the accessory use must be clearly incidental to, and customarily found in connection with, the principal use. The limited case law on the definition of accessory use has accorded significant flexibility to the term, albeit turning on particular factual circumstances, so that the application of the term, it seems, remains ad hoc (*see e.g. Matter of New York Botanical Garden v Board of Stds. & Appeals of City of N.Y.*, 91 NY2d 413, 420-423 [1998]). However, even in the *New York Botanical Garden* case, the Court of Appeals required close application of the statutory terms, prohibited judicially crafted expansions beyond the City Council's own specific terminology, and alluded to the exacting specificity by which "home occupation" was defined in contrast to the more general "accessory use." Moreover, the occupant's use must be incidental to the occupant's residence, which logically conveys that the occupant's own production, whether commercially successful or not, arises in connection with the occupant's residency. This term "incidental to" also is not clearly defined, except to describe it as secondary to the residence, but given the entire focus on the occupant's own activities and production that arise in connection with his or her residence, the term would logically not apply to allowing others to use the premises for their own

production. Hence, allowing other persons to use the space and services for a fee is not incidental to petitioner's own residency, and in that sense also fails to satisfy the definition (*see e.g. Matter of Criscione v Wallace*, 145 AD2d 697 [1988] [although use of residential premises by lawyer for a home office was incidental to residency, use of same space by another lawyer, even if working with occupant, was not incidental to occupant's residency]).

In the present case, how far "home occupation" may be expanded is squarely in issue. The Zoning Resolution itemizes activities that constitute (§ 12-10 [Home occupation] [c]), or do not constitute (*id.* para [d]), home occupations, though it is not clear whether the list is an exclusive one (*cf. Matter of Exxon Corp. v Board of Stds. & Appeals of City of N.Y.*, 128 AD2d 289 [1987] [noting nonexclusivity of relevant listing and prior Board of Standards and Appeals policy, finding convenience store was an accessory use for a gas station]). Even if not exclusive, though, the legislative thrust, insofar as particular activities are expressly included and excluded, does convey a goal of protecting artistic and professional uses that are incidental to residency, but not general commercial uses (*see e.g. People v Cully Realty*, 109 Misc 2d 169 [1981], *appeal dismissed* 55 NY2d 879 [1982] [nonexclusive list nevertheless conveyed that permissible accessory home occupation uses under local zoning included professionals, but not real estate broker, which was not considered to be a profession by common understanding]). A music recording studio to be rented to third parties is not listed as an authorized home occupation, nor does it fit the general categories described as permissible. A "fine arts studio," although it is not further defined, is an approved activity, assuming that all other requirements are satisfied. This use has the closest obvious application to a home recording studio, so it is logical that we look to the artistic commercial use of these premises in determining whether the exemption applies. However, even if we viewed petitioner's recording business itself, as contrasted with home recording, as an unlisted ancillary use, we would still find that it contravenes the legislative intent as being neither incidental to his residency nor as comporting with the categories of home occupations generally described.

It is clear that rather than using the studio to record his own music for his own pleasure or even for sale of his own recordings, petitioner allows nonoccupants to use the studio for a fee. No matter how petitioner tries to splice terms, this use is

commercial rent, and not petitioner's own recording of his own music. As such, the putative ancillary use is actually to rent out space, even if on a very transient basis, and technical services and equipment commercially, which happen to be for recording music, and not for musical recording per se, or at least not petitioner's own recording. Petitioner basically accepts this distinction, but argues that "home occupation" does not exclude his use of a portion of the premises for employment of his technological skills. But to argue that petitioner's participation in the technical side of the recording somehow converts the occupation into his own "home" recording "occupation" is a semantic contortion of what the ordinance obviously intended. Such a use is contrary to the legislative goal of allowing an occupant to use part of his residence for his own artistic or professional occupation, as contrasted with renting a substantial portion of the premises to nonoccupants for their own musical recordings.

Even if the list of permissible accessory uses is viewed as nonexclusive, the challenged use in this case clearly does not comport with legislative goals. Such a distinction between personal use for artistic or professional purposes, and the use of one's residence for the commercial activities of third parties, was aptly noted by the Appellate Term in *Ansonia Assoc. v Bozza* (180 Misc 2d 702 [1999]). In *Ansonia Associates*, the tenant musician's own provision of musical instruction to others, even if for a fee, and his own rehearsals of his own music would have been permissible uses, but renting out rooms and musical equipment to several others on a regular basis was impermissible. Appellate Term noted that "[t]he rent stabilization laws protect premises which are utilized primarily for residential purposes, not professional enterprises" and that "the nature and extent of [that] tenant's use [did] not qualify as an accessory 'Home occupation' under New York City Zoning Resolution § 12-10" (*id.* at 703-704). So, too, here, where it is undisputed that petitioner is not using the studio for his own musical compositions: there is no logic to stretching the term "home occupation" beyond the meaning intended by the City Council. By contrast, we were more receptive to viewing a resident music teacher's lessons to one student at a time as a valid home occupation under section 12-10 in *Besser v Beckett* (253 AD2d 648 [1998]), subject to reasonable restrictions on time periods, duration and volume.

These conclusions accord with the general thrust of articles 7-B and 7-C of the Multiple Dwelling Law, otherwise known as

the "Loft Law," which were intended to allow for mixed use under particular circumstances. Here, too, petitioner, because of the nature of his ancillary use, cannot claim relief. He is not an artist, but, rather, is essentially acting as a commercial enterprise which rents out technical services and a portion of his premises to nonoccupants. Article 7-B, added in 1985, gave New York State legislative imprimatur to the joint residential/ commercial use of formerly industrial premises to artists under particular circumstances. Article 7-C, enacted in 1982, governed conversion of former industrial premises, generally lofts, to residential uses. The Loft Law was enacted in 1982 in response to significant demographic and real estate trends arising from the large scale conversion of commercial and industrial lofts to quasi-residential uses which also included working space for the occupants. The trend was surreptitious, and generally illegal, but was essentially tolerated by owners and City officials during the depressed real estate market of the 1970s. During this time period, petitioner started the occupancy of the premises. The trend by which industrial lofts were rented out for residential uses became less tolerated as the real estate market changed, albeit at a time when residential use of loft space, especially in lower Manhattan, was an accomplished, if still unlawful, fact. Notably, many of these nonconforming occupants of abandoned lofts were artists of various kinds, who used the spacious and often naturally illuminated premises for artistic production. Acceptance of these arrangements brought obvious benefits to artists who paid low rent, but also benefitted owners whose prior traditional industrial tenants had relocated as their industries moved elsewhere or became obsolete. Neighborhoods were also benefitted by new residents who added population density in areas traditionally underpopulated. Even the City as a whole benefitted as an artistic renaissance was sparked and, by virtue of the initial official inattention, inadvertently nurtured. Local vendors realized commercial benefits, and, if these residencies could be regularized, the City might receive ratables in lieu of lost taxes on industrial revenues. Article 7-C recognized that the unauthorized conversions posed problems of habitability and other problems otherwise governed by local building codes, but that the continuing de facto, but unauthorized, use of the premises by artists for residential and commercial uses was unlikely to encourage efforts to bring the premises up to code. Hence, in order to bring legal regularity to the growing neighborhood stability encouraged by the mixed residential

and commercial use of loft space by artists, the Loft Law was enacted. However, the joint residential and commercial use, or "joint living and working quarters," permitted by the law was carefully hedged in article 7-B of the Multiple Dwelling Law. It bears emphasizing that the broader legislative scheme was geared toward artists, even as such an occupation may be broadly defined, rather than being intended to allow the conversion of industrial premises to unrestricted integrated residential and commercial uses.

This approach is borne out in the statement of legislative purpose. Multiple Dwelling Law § 275 sets forth the legislative findings for article 7-B relating to joint living-work quarters for artists. In prefatory language, the Legislature noted that in large cities, large numbers of such loft, former manufacturing and other large commercial spaces were losing tenants to more modern kinds of buildings or to other locations, but that such an economic drain was occurring simultaneously with the need for more residential space, and that such older buildings, suitably altered, could be made available as housing stock for moderate and middle income families and for artists who worked at home. For the latter group, the Legislature found that "[t]here is a public purpose to be served by making accommodations readily available for joint living-work quarters for artists * * * ." (*Id.*) The legislative findings noted that "persons regularly engaged in the arts require larger amounts of space for the pursuit of their artistic endeavors and for the storage of the materials therefor and of the products thereof than are regularly to be found in dwellings subject to this article." (*Id.*) The findings also noted that artists typically received only modest income from their art, which impeded their ability to rent out commercial space for doing art in addition to residential premises, especially in the crowded real estate market of larger cities, and that there was a distinct community benefit in encouraging artists to stay and create art. As such, the conversion of lofts and other formerly used industrial premises to use by artists where they could live and work provided a benefit, by the legislative fiat of zoning accommodation, to artists as well as to the community, without displacing those manufacturers who were leaving anyway. Similarly, article 7-C reflected that artist "pioneers" of many of these erstwhile rundown neighborhoods were the intended beneficiaries of the new legislation, with the expectation that such protections would also correlate with creative benefits on the creative and economic life of cities (*see* Mem of NY City Legis Rep in Sup-

port of L 1982, ch 349, 1982 McKinney's Session Laws of NY, at 2479, 2484). Additionally, the New York City Zoning Resolution was also amended to allow for joint working and residential use of certain premises. However, this innovative legislation was not intended to be a windfall to other kinds of commercial enterprises, even if they are tangentially affiliated with the arts. Hence, section 276 carefully defines "artist" as "a person who is regularly engaged in the fine arts, such as painting and sculpture or in the performing or creative arts, including choreography and filmmaking, or in the composition of music on a professional basis, and is so certified by the city department of cultural affairs and/or state council on the arts." By no logical definition, then, may "artist" be defined to also include one who rents out space and technical equipment and services to those who actually do the musical composition and performance.

Hence, petitioner cannot avail himself of the broader "home occupation" provision of the New York City Zoning Resolution, nor is he benefitted by the limited exemption afforded to artists in the New York Loft Law. Under both statutes, petitioner does not qualify as an "artist." Rather, he is acting only as a commercial enterprise that is not the intended beneficiary of either body of law.

Accordingly, the determination of respondent Environmental Control Board dated December 15, 1999, that petitioner violated the home occupation zoning regulations by renting out a portion of his loft apartment as a recording studio, should be confirmed, without costs, the petition denied and the proceeding brought pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, New York County [Diane Lebedeff, J.], entered on or about March 12, 2001), should be dismissed.

SAXE, SULLIVAN, ROSENBERGER and LERNER, JJ., concur.

Determination of respondent Environmental Control Board dated December 15, 1999, confirmed, without costs, the petition denied and the proceeding dismissed.