[924 NE2d 785, 897 NYS2d 677]

Glacial Aggregates LLC, Appellant, v Town of Yorkshire, Respondent.

Argued January 14, 2010; decided February 18, 2010

## POINTS OF COUNSEL

*Magavern Magavern Grimm LLP*, Niagara Falls (*Edward P. Perlman* and *James L. Magavern* of counsel), and *Hopkins & Sorgi, PLLC*, Williamsville (*Peter J. Sorgi* of counsel), for appellant. I. The Town of Yorkshire's actions deprived Glacial Aggregates LLC of a constitutionally vested right to the use of its land for mining, thereby rendering it liable for damages under 42 USC § 1983. (*People v Miller*, 304 NY 105; *Matter of Ellington Constr. Corp. v Zoning Bd. of Appeals of Inc. Vil. of New Hempstead*, 77 NY2d 114; *Matter of Temkin v Karagheuzoff*, 34 NY2d 324; *Matter of Bayswater Health Related Facility v Karagheuzoff*, 37 NY2d 408; *Matter of Faymor Dev. Co. v Board of Stds. & Appeals of City of N.Y.*, 45 NY2d 560; *Town of Orangetown v Magee*, 88 NY2d 41; *Matter of Syracuse Aggregate Corp. v Weise*, 51 NY2d 278; *Preble Aggregate v Town of Preble*, 263 AD2d 849.) II. Glacial Aggregates LLC has a right to mine under the express terms of the Town of Yorkshire's Zoning Law. (*FGL & L Prop. Corp. v City of Rye*, 66 NY2d 111; *Stringfellow's of N.Y. v City of New York*, 91 NY2d 382; *Matter of Toys "R" Us v Silva*, 89 NY2d 411; *Matter of Syracuse Aggregate Corp. v Weise*, 51 NY2d 278; *People v Miller*, 304 NY 105.)

*David J. Seeger*, East Aurora, *Anthony DiFilippo III* and *Richard Lam* for respondent. I. Glacial Aggregates LLC failed to establish a nonconforming use to mine the subject property. (*People v Miller*, 304 NY 105; *Matter of Rudolf Steiner Fellowship Found. v De Luccia*, 90 NY2d 453; *Matter of Syracuse Aggregate Corp. v Weise*, 51 NY2d 278; *Buffalo Crushed Stone, Inc. v Town of Cheektowaga*, 13 NY3d 88; *Matter of Toys "R" Us v Silva*, 89 NY2d 411; *Cooper v City of New York*, 81 NY2d 584; *Merrill v Albany Med. Ctr. Hosp.*, 71 NY2d 990; *Matter of Lezette v Board of Educ., Hudson City School Dist.*, 35 NY2d 272; *Matter of Skenesborough Stone v Village of Whitehall*, 272 AD2d 674.) II. Glacial Aggregates LLC failed to establish that it acquired vested rights to mine its property. (*Town of Orangetown v Magee*, 88 NY2d 41; *Matter of Smith v Spiegel & Sons*, 31 AD2d 819; *Matter of Temkin v Karagheuzoff*, 34 NY2d 324; *Matter of Bayswater Health Related Facility v Karagheuzoff*, 37 NY2d 408; *Matter of Faymor Dev. Co. v Board of Stds. & Appeals of City of N.Y.*, 45 NY2d 560; *Matter of Pokoik v Silsdorf*, 40 NY2d 769; *Matter of Rudolf Steiner Fellowship Found. v*

*DeLuccia,* 90 NY2d 453; *People v Bing,* 76 NY2d 331; *Matter of Higby v Mahoney,* 48 NY2d 15; *Matter of Ellington Constr. Corp. v Zoning Bd. of Appeals of Inc. Vil. of New Hempstead,* 77 NY2d 114.) III. Glacial Aggregates LLC failed to establish a substantive due process claim under 42 USC § 1983. (*Harlen Assoc. v Incorporated Vil. of Mineola,* 273 F3d 494; *Lisa's Party City, Inc. v Town of Henrietta,* 185 F3d 12; *Bower Assoc. v Town of Pleasant Val.,* 2 NY3d 617; *Cine SK8, Inc. v Town of Henrietta,* 507 F3d 778; *Town of Orangetown v Magee,* 88 NY2d 41; *Buffalo Crushed Stone, Inc. v Town of Cheektowaga,* 13 NY3d 88; *Natale v Town of Ridgefield,* 170 F3d 258; *Granada Bldgs. v City of Kingston,* 58 NY2d 705; *Bower Assoc. v Town of Pleasant Val.,* 2 NY3d 617; *Ferran v Town of Nassau,* 471 F3d 363.)

*Gilberti Stinziano Heintz & Smith, P.C.,* Syracuse (*Kevin G. Roe, Adam J. Schultz* and *Michael A. Fogel* of counsel), for New York Construction Materials Association, Inc., amicus curiae. I. Glacial Aggregates LLC's investment in obtaining the Department of Environmental Conservation permit should be considered in determining whether Glacial acquired a vested right to mine the subject property. (*Town of Orangetown v Magee,* 88 NY2d 41; *Matter of Chrysler Props. v Morris,* 23 NY2d 515; *Town of Somers v Camarco,* 308 NY 537; *People v Miller,* 304 NY 105; *Matter of Ellington Constr. Corp. v Zoning Bd. of Appeals of Inc. Vil. of New Hempstead,* 77 NY2d 114; *Matter of Syracuse Aggregate Corp. v Weise,* 51 NY2d 278.) II. Glacial Aggregates LLC's activities on the subject property after issuance of the Department of Environmental Conservation mining permit constituted mining and established the use prior to the zoning change. (*Matter of Syracuse Aggregate Corp. v Weise,* 51 NY2d 278.) III. The Court should consider joining the growing number of states that hold that vested rights accrue at the time an application for a permit is made.

## OPINION OF THE COURT

READ, J.

Glacial Aggregates LLC (Glacial or the company) was formed in 1996 to conduct sand and gravel mining after John M. Clarey, one of its principals, learned that the Buffalo area needed additional sources of sand and aggregates. At the time, Clarey had 20 years of experience in oil and gas drilling in Western New York.

Glacial scouted out potential mining sites along Route 16 in Cattaraugus County, where receding glaciers had deposited vast

amounts of aggregate materials, and ultimately settled on property within the Town of Yorkshire (the Town). The Town had no zoning law. As a result, a mining permit from the New York State Department of Environmental Conservation (DEC) was the only governmental permission required to mine sand and gravel in the Town. Glacial purchased or acquired options to purchase 375 acres of land (the property) in the Town for $250,000. Ninety-five acres were to be mined; the remaining land was intended as a buffer to shield the neighbors from the mining operation.

By the fall of 1996, Glacial had begun the time-consuming and costly process of fulfilling the requirements for a DEC mining permit (*see* ECL art 23, tit 27 [Mined Land Reclamation Law]). This entailed preparing a full environmental impact statement to comply with the State Environmental Quality Review Act (SEQRA); undertaking a hydrogeologic study of groundwater flow, a soil testing study, a traffic study, a wetlands analysis, and a human impact analysis to address issues such as noise and visual impacts; and developing a reclamation plan. The company ultimately spent about $500,000 in engineering and environmental expert fees to conduct these studies and create these plans.

In 1998, the Town Board (the Board) adopted a resolution declaring a moratorium on gravel mining, cell towers and automobile repair shops in the Town. Meanwhile, in September 1999, DEC handed down its SEQRA findings statement, and issued a five-year mining permit to Glacial. Among other things, the permit required the company to build and pave the last 500 feet of a haul road and install a bridge over a creek on the property before starting up commercial mining. On March 13, 2000, Glacial advised the Board of the issuance of the DEC permit. In response, the Board lifted the moratorium on gravel mining that same day.

In May 2000, Glacial excavated 20 truckloads of sand and gravel from the property, and sold this material to a potential purchaser and joint venturer for testing; the company excavated an additional 20 truckloads in October 2000, which was sold to another possible industry customer and business partner. In 2000 and 2001, Glacial dug approximately 40 pits on the property with an excavator, and 30 to 40 holes with a drill rig to figure out where the aggregate deposits were concentrated. Glacial also cut and cleared four acres of trees in preparation for extraction of materials and road construction.

With the exception of completing the bridge and haul road, then, Glacial had readied the property for commercial mining by the end of 2000. Over the next few years, the company continued to clear trees, monitor wells, submit quarterly reports to DEC, and make various required annual payments. Glacial designed and obtained steel for but did not finish either the bridge, estimated to cost $80,000 to $100,000, or the haul road, estimated to cost $10,000.

On June 11, 2001, the Town adopted its first Zoning Law, which generally prohibited gravel mining absent a special use permit. Section 10.1 expressly exempted prior nonconforming uses, though, by providing that "[e]xcept as otherwise provided herein, any lawfully established use of a building or land existing at the time of the enactment of this law, or any amendments thereto, may be continued although such use does not conform to the provisions of this law." Clarey at first considered the new Zoning Law to be "good for [Glacial] because no new mines could have been established near . . . or next to [it], and further, [the law] didn't apply to [Glacial which] . . . spent all this money and got the permit and the moratorium was lifted before the zoning was passed."

In late 2003 or early 2004, Glacial updated the Board about its activities, advising that it had attracted additional investors to supply capital, and that a new limited liability company headed by Clarey would acquire Glacial's assets (the property and the permit) for $1,250,000. By June of that year, the company's principals had invested roughly $840,000 in the business, and Clarey had secured a $2.9 million loan commitment from a Buffalo bank to finance full-scale mining operations.

Before closing on the loan, the bank required a letter from the Town confirming that local zoning restrictions did not prevent Glacial from mining the property. Accordingly, the Town Supervisor, at the company's request, sent Clarey a letter dated July 8, 2004 verifying that

> "it is the position of the Town . . . that Glacial has the right to operate the sand and gravel mine in the [Town], provided that actual mining operations are commenced prior to the expiration of the initial 5 year term of the New York State Department of Environmental Conservation Mining Permit."

The original DEC permit, which was renewable for additional five-year periods, was set to expire in September 2004.

On July 12, 2004, however, the Board passed a motion

> "authorizing [the Supervisor] to mail a new letter
> . . . [revoking] a letter dated July 8, 2004 . . . stat-
> ing that the [Board] supported [Glacial's] proposed
> mining operations in the town, and in the new let-
> ter stating that NYS DEC issued Mining Permits
> that were issued to presently inactive Mining Sites
> are subject to the 2001 Town of Yorkshire Zoning
> Laws."

In a letter dated July 22, 2004, the Supervisor informed Clarey as follows:

> "Please be advised that my letter of July 8, 2004
> was issued in error.
>
> "After consultation with the Town Attorney, Zoning
> Officer and members of the Town Board, we have
> determined that the proposed gravel mining opera-
> tion in the Town of Yorkshire must comply with the
> Town Zoning Law, since actual mining operations
> were not commenced prior to the adoption of the
> Zoning Law."

According to Clarey, this letter "absolutely decimated [him] because [he] had to call the bank and the partners and tell them we're done. It just came as a shock."

On August 22, 2004, Glacial commenced this action for a judg-ment declaring that it was entitled to operate a sand and gravel mine at the property pursuant to the DEC mining permit, and any extensions or renewals, without having to obtain a special use permit. The Town accepted a proposed settlement of the lawsuit by a Board resolution adopted on September 21, 2004, which specified that Glacial was allowed to mine; the Board then passed a second resolution, stating that Glacial could com-mence mining upon stipulations established by the Board. But then, on October 12, 2004 the Board reneged, passing a resolu-tion rescinding the two September resolutions.

Glacial served an amended complaint on March 4, 2005, alleg-ing a prior nonconforming use and deprivation of a vested right in contravention of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, entitling the company to damages pursuant to 42 USC § 1983. A jury trial ensued on May 15, 2007. At the conclusion of Glacial's case, the Town moved for a directed verdict declaring that the sand and

gravel mining on the property was not a lawful nonconforming use, and that Glacial had not acquired a vested right to mine the property. Supreme Court denied the motion, and the jury subsequently returned a verdict in Glacial's favor. The jury decided that Glacial had a preexisting, nonconforming right and a vested right to mine the property, and awarded the company $190,000 in damages for the deprivation of its federally secured vested right. The Town appealed.

On December 31, 2008, the Appellate Division reversed Supreme Court's judgment upon the jury verdict; granted the Town's motion for a directed verdict; and granted judgment in favor of the Town "declar[ing] that the mining of sand and gravel aggregate on the property . . . is not a lawful nonconforming use and that [Glacial] did not acquire a vested right to mine the property" (*Glacial Aggregates LLC v Town of Yorkshire*, 57 AD3d 1362, 1363 [4th Dept 2008]). The court concluded that Glacial's proof at trial "did not demonstrate that the property was actually being used for [a] nonconforming purpose at the time the zoning ordinance became effective" in 2001 (*id.* at 1364). This was so because none of the activities that Glacial undertook after issuance of the DEC mining permit constituted actual mining; rather, they were "performed merely in contemplation of mining" (*id.* at 1363).

The Appellate Division further decided that Glacial did not acquire a vested right to mine pursuant to a validly issued permit because it did not effect substantial construction or changes on the property, or incur substantial expenses; specifically, the company did not complete the haul road or the bridge, and its expenditures were principally made to acquire land and obtain the DEC mining permit. According to the court, because the bulk of Glacial's expenditures were incurred "before it obtained the mining permit and were not incurred by plaintiff in reliance on the permit, they do not constitute the type of substantial expenditures that would entitle [the company] to a vested right to mine its property" (*id.* at 1365, citing *Preble Aggregate v Town of Preble*, 263 AD2d 849, 851-852 [3d Dept 1999], *lv denied* 94 NY2d 760 [2000] [landowner did not establish vested right to mine under circumstances where, despite knowledge of town's amendment of zoning law to expand the existing limitation on mining to an outright prohibition, landowner "willingly proceeded with efforts and expenditures to gain (mining) permits from both the DEC and the Town" (*id.* at 851)]). Glacial now appeals as of right on constitutional grounds pursuant to CPLR 5601 (b) (1), and we reverse.

"[N]onconforming uses or structures, in existence when a zoning ordinance is enacted, are, as a general rule, constitutionally protected and will be permitted to continue, notwithstanding the contrary provisions of the ordinance" (*People v Miller*, 304 NY 105, 107 [1952]). Further, the decisions allowing continuation of an existing nonconforming land use after enactment of a zoning ordinance

> "are sometimes put on the ground that the owner has secured a 'vested right' in the particular use— which is but another way of saying that the property interest affected by the particular ordinance is too substantial to justify its deprivation in light of the objectives to be achieved by enforcement of the provision" (*id.* at 108).

Hence, even the "advantage . . . of more complete and effective zoning" does not justify the "destruction of substantial businesses or structures developed or built prior to the adoption of [the] zoning ordinance" (*id.*; *see also Matter of Ellington Constr. Corp. v Zoning Bd. of Appeals of Inc. Vil. of New Hempstead*, 77 NY2d 114, 122 [1990] ["(W)here a more restrictive zoning ordinance is enacted, an owner will be permitted to complete a structure or a development which an amendment (or new zoning ordinance) has rendered nonconforming only where the owner has undertaken substantial construction and made substantial expenditures prior to the effective date of the amendment"]).

In *Town of Orangetown v Magee* (88 NY2d 41 [1996]), we more recently considered whether a property owner possessed a vested right to continue a nonconforming use. There, the Magees, intending to erect a 184,000-square-foot industrial building on their property, acquired a building permit from the Town of Orangetown. After community opposition to the planned building emerged, the Town revoked the permit and amended the zoning code to preclude construction of commercial buildings on the Magees' property. By the time the Town took these actions, however, the Magees had spent over $4 million on improvements for the land and building.

In an action brought by the Town to compel removal of a temporary building erected on the land for use during the preliminary stages of construction, the Magees counterclaimed. Contending that they possessed a vested right in the planned construction, the Magees sought reinstatement of the building permit and damages pursuant to 42 USC § 1983. Supreme Court

concluded that the Magees had established a vested property interest, and had shown that the Town rescinded the permit "solely to satisfy political concerns" (*id.* at 47; *see also Bower Assoc. v Town of Pleasant Val.*, 2 NY3d 617 [2004] [*Town of Orangetown*'s two-part test for substantive due process violations in the land-use context requires claimants to establish deprivation of a vested property interest and that the challenged governmental action was wholly without legal justification]). Accordingly, the trial court ordered the Town of Orangetown to reinstate the Magees' building permit, and awarded them damages of $5,137,126, costs and attorneys' fees. The Appellate Division affirmed, as did we.

■ We explained that a property owner obtains a vested right when "pursuant to a legally issued permit, the landowner demonstrates a commitment to the purpose for which the permit was granted by effecting substantial changes and incurring substantial expenses to further the development" (*id.* at 47). We emphasized, though, that "[n]either the issuance of a permit nor the landowner's substantial improvements and expenditures, standing alone, will establish the right. The landowner's actions relying on a valid permit must be so substantial that the municipal action results in serious loss rendering the improvements essentially valueless" (*id.* at 47-48 [citations omitted]).

When applying our vested-rights jurisprudence to the facts in this case, there are two significant considerations that must be kept in mind. First, the Town had *no* zoning laws when Glacial acquired the property in 1996—or, for that matter, when Glacial applied for the DEC mining permit in 1996, or even when DEC issued Glacial a mining permit in 1999 (*cf. Preble Aggregate, supra*). Relatedly, mining is a unique land use, which colors our analysis of vested rights and nonconforming use.

In *Town of Orangetown* and *Matter of Ellington*, the property owners spent considerable sums of money in reliance on a building permit and a subdivision approval respectively, which were subsequently revoked. Correspondingly, Glacial spent $500,000 in reliance upon local permission, subsequently retracted after the Town enacted the Zoning Law, to mine sand and gravel on its property as of right. Put another way, the issue is not whether Glacial gained a vested right by way of its DEC mining permit, but whether Glacial acquired a vested right by way of the unqualified Town permission it once enjoyed to mine its property. And when deciding whether a landowner has made substantial expenditures in reliance upon such local permission,

we see no reason for the factfinder to disregard DEC permitting costs. Indeed, in light of the stringent requirements imposed by the Mined Land Reclamation Law, such costs frequently, if not invariably, run into the hundreds of thousands of dollars or more, and represent a significant portion of the investment necessary for a landowner to devote real property to quarrying.

Further, while substantial construction evidences substantial change or improvements, as was the case in *Town of Orangetown* and *Matter of Ellington*, little needed to be built for mining to take place at the property—i.e., the processing plant would have been a portable unit. The key requirement, of course, was the DEC mining permit. Moreover, any physical alteration of the land related to mining was prohibited until the SEQRA review was complete and the DEC mining permit was in hand (*see* 6 NYCRR 617.3 [a]; ECL 23-2711 [1] [anyone mining or proposing to mine "more than one thousand tons, or seven hundred fifty cubic yards, whichever is less, of minerals from earth within twelve successive calendar months" must first obtain article 23 permit]). Once that happened, Glacial

> "allowed two sand and gravel companies to remove a total of 40 truckloads or 400 tons of material for testing; . . . removed timber throughout the property; . . . surveyed and staked out the locations of the mining areas and the haul road; . . . drilled many test holes, designed and obtained steel for a required bridge, and dug and monitored watertable wells" (*Glacial Aggregates*, 57 AD3d at 1363).

The only improvements to the land remaining to be completed were the haul road and the bridge. In view of this evidence, a rational jury could find that Glacial effected substantial changes or made substantial improvements to the property in reliance upon local permission to mine sand and gravel on its property as of right. Moreover, "the [Town's] action result[ed] in serious loss rendering [Glacial's] improvements essentially valueless" (*Town of Orangetown*, 88 NY2d at 48).

Finally, the same evidence is sufficient for a rational jury to conclude that "the property was . . . used for [a] nonconforming purpose, as distinguished from a mere contemplated use, at the time the zoning ordinance became effective" (*Matter of Syracuse Aggregate Corp. v Weise*, 51 NY2d 278, 284-285 [1980]). In our recent decision in *Buffalo Crushed Stone, Inc. v Town of Cheektowaga* (13 NY3d 88 [2009]), we made clear that although mining permits are not "a prerequisite to establishing prior

nonconforming use rights," they are "[n]evertheless . . . strong evidence of a manifestation of intent to mine a given area" (*id.* at 101-102). And "[a] party advancing a prior nonconforming use exception to a zoning ordinance must establish specific actions constituting an overt manifestation of its intent to utilize the property for the ascribed purpose [e.g., mining] at the time the zoning ordinance became effective" (*id.* at 98).

Actions that we found sufficient to exhibit an "overt manifestation of . . . intent" in *Buffalo Crushed Stone* are no more extensive than the activities pursued by Glacial. For example, we determined that the following undertakings established a preexisting nonconforming use at one parcel: preparation of maps to survey the potential materials to be extracted from the subparcel, putting 6,000 feet of pipe in place, negotiations to relocate a road, correspondence expressing an intent to mine the subparcel, preparations for removal of dirt, and drilling auger holes to identify areas for quarrying (*id.* at 100). We also concluded that two subparcels that had been cleared, grubbed, and stripped of topsoil—and which were the subject of mining permits before the zoning change—enjoyed nonconforming use status (*id.* at 103).

Accordingly, the order of the Appellate Division should be reversed, with costs, and the case remitted for consideration of issues raised but not determined on the appeal to that court.

Chief Judge Lippman and Judges Ciparick, Graffeo, Smith, Pigott and Jones concur.

Order reversed, etc.