Matter of Peyton v New York City Bd. of Stds. & Appeals (2018 NY Slip Op 06870)





Matter of Peyton v New York City Bd. of Stds. & Appeals


2018 NY Slip Op 06870


Decided on October 16, 2018


Appellate Division, First Department


Oing, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on October 16, 2018
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Dianne T. Renwick, J.P.
Peter Tom
Troy K. Webber
Jeffrey K. Oing, JJ.


161972/15 5193 

[*1]In re Randy Peyton, etc., Petitioner-Appellant, Hillel Hoffman, et al., Intervenors-Petitioners-Appellants,
v
New York City Board of Standards and Appeals, et al., Respondents-Respondents, Margery Perlmutter, etc., et al., Respondents. Landmark West, Amicus Curiae.



Petitioners appeal from the judgment (denominated decision/order) of the Supreme Court, New York County (Joan Lobis, J.), entered August 9, 2016, denying the petition seeking to annul a resolution of respondent New York City Board of Standards and Appeals, dated August 18, 2015, which upheld a decision of the New York City Department of Buildings that granted a permit to respondent Jewish Home Lifecare, Inc. for




the construction of a nursing home, and dismissing the proceeding brought pursuant to CPLR article 78.
John R. Low-Beer, Brooklyn, and New York Environmental Law and Justice Project, New York (Joel R. Kupferman of counsel), for appellants.
Zachary W. Carter, Corporation Counsel, New York (Jonathan A. Popolow, Richard Dearing and Devin Slack of counsel), for New York City Board of Standards and Appeals, respondent.
Greenberg Traurig, LLP, New York (Steven C. Russo, Carmen Beauchamp Ciparick, Robert Rosenthal and Evan Preminger of counsel), for Jewish Home Lifecare, Inc., respondent.
Kramer Levin Naftalis & Frankel LLP, New York (Jeffrey L. Braun of counsel), for PWV Acquisition, LLC, respondent.
Marcus Rosenberg & Diamond LLP, New York (David Rosenberg of counsel), for amicus curiae.



OING, J.


This appeal seeks to annul respondent New York City Board of Standards and Appeals' (BSA) resolution, which upheld the New York City Department of Buildings' (DOB) decision that granted a permit for the construction of a nursing home on the Upper West Side. At the heart of this dispute, which brings to light once again the unavoidable tension between urban development and quality of life in neighborhoods that make up the unique fabric of New York City, an already densely populated metropolis, is whether this construction would violate the "open space" mandate embodied in the New York City Zoning Resolution. Indeed, under the auspices of the Zoning Resolution, the City's residential districts are to be designed to promote and protect public health, safety and general welfare (ZR Preamble). The general goals include, among other things, protecting residential areas against congestion, requiring open space in residential areas, opening up residential areas to light and air, providing open areas for rest and recreation, and breaking "the monotony of continuous building bulk" so as to provide a "more desirable environment for urban living in a congested metropolitan area" (ZR § 21-00[d]). Striking a mutually acceptable balance between these conflicting interests of urban development and quality of life has never been easy, as evidenced by this dispute (see also Matter of Friends of P.S. 163, Inc. v Jewish Home Lifecare, Manhattan, 30 NY3d 416 [2017]; Chenkin v 808 Columbus LLC, 570 F Supp 2d 510 [SD NY 2008], affd 368 Fed Appx 162 [2d Cir 2010], cert denied 562 US 1102 [2010]; Bunten v New York City Bd. of Stds. & Appeals, Sup Ct, NY County, Gische, J., index No. 102750; Park West Village Tenants Assn. v PWV Acquisition LLC, Sup Ct, NY County, index No. 603756). The fact that the dispute involves opposition from neighborhood residents to the construction of a nonprofit nursing home, arguably an altruistic endeavor, only underscores and magnifies this tension.
Petitioner Maggi Peyton [FN1] and petitioners-intervenors are residents of Park West Village, located on the Upper West Side. Respondent BSA is an administrative board composed of five [*2]commissioners, including the individual respondents in this proceeding, with authority to, among other things, hear and determine appeals from decisions of DOB, which is the municipal agency responsible for enforcing the rules and regulations governing the construction and use of buildings in the City. Respondent Jewish Home Lifecare, Inc. (JHL) is a not-for-profit corporation and member of the Jewish Home Lifecare System. Respondent PWV Acquisition, LLC (Owner) owns the property that is the subject of the instant dispute.
Park West Village (PWV) is a complex located on a "superblock" and constructed on a zoning block that is bounded by Columbus and Amsterdam Avenues, and 97th and 100th Streets [FN2]. It was built in the 1950s and 1960s as part of a federally subsidized middle income urban renewal project, and includes residential buildings, a school, a church, a public library, a health center, and commercial buildings. The residential buildings are the original three 16-story buildings, located at 784, 788, 792 Columbus Avenue, and a more recently constructed residential and commercial building at 808 Columbus Avenue (808 Columbus). The zoning lot was subject to a 40-year deed restriction prohibiting construction on the site until 2006. The zoning lot area is 308,475 square feet, and its required minimum open space under the Zoning Resolution is 230,108 square feet (required minimum open space)[FN3]. Owner acquired the zoning lot shortly before expiration of the deed restriction. To put this dispute in context, a brief discussion of the applicable Zoning Resolution and the 808 Columbus controversy is in order.
"Open space" under the Zoning Resolution has always been defined as:
"that part of a #zoning lot#, including #courts# or #yards#, which is open and unobstructed from its lowest level to the sky and is accessible to and usable by all persons occupying a #dwelling unit# or a #rooming unit# on the #zoning lot#"(ZR § 12-10).[FN4]
With respect to the definition of a zoning lot, the 1961 Zoning Resolution provided that, although a zoning lot "may or may not coincide with a lot as shown on the official tax map[s]," it must be in "single ownership," with that term being defined to include "a lease of not less than 50 years duration, with an option to renew such lease so as to provide a total lease of not less than 75 years duration." Thus, a zoning lot could only consist of land that was entirely under the control of a single owner or a long-term lease. Under the single owner situation, the assumption would be that a single owner, who controls the entire zoning lot, would be capable of providing open space access to the entire zoning lot. The 1961 Zoning Resolution did not contemplate the possibility that a zoning lot could consist of multiple parcels under different ownership and control, with each parcel subject to its own unique conditions governing open space access.
In 1977, the City Planning Commission (CPC) proposed fundamental changes, which [*3]were adopted, to the Zoning Resolution's definition of "zoning lot" by eliminating the requirement that a zoning lot be held in "single ownership." In its July 13, 1977 report, CPC noted that the "single ownership" requirement created "serious problems" with respect to unused development rights and to interested parties' legal rights, and, that the remedy was to replace the "single ownership" with a provision permitting multi-ownership and control on a single zoning lot to ensure protection of all parties with interests in multiple buildings on the zoning lot. Nearly 30 years later, this fundamental change to the "zoning lot" definition gave birth to the 808 Columbus dispute  namely, how to reconcile the "open space" definition (access to all) with a "zoning lot" that is improved with multiple buildings. Indeed, at the April 14, 2015 hearing concerning the JHL building, BSA's Chair, Margery Perlmutter, recognized that in the context of a large zoning lot with multiple buildings under separate ownership, open space accessible and usable by residents of every building on such a zoning lot was not feasible or practicable. She highlighted this problem by offering the example of owners of townhouses on a multi-building zoning lot. Perlmutter opined that these multi-owners would, understandably, be reluctant to let residents of other buildings on the lot into their backyards ("[W]here you've got a big zoning lot . . .  that's made up of lots and lots of unrelated tax lots, all other kinds of buildings can't possibly  I'm not letting you into the backyard of my townhouse, just forget it, right"). Obviously, her comments appear to indicate that if compelled to provide access to all residents on a zoning lot owners would claim that it would be an intrusion on their property rights.
In June 2007, Owner, or its affiliate, obtained a permit from DOB to construct 808 Columbus, a 29-story apartment tower, with two single-story attached wings to accommodate commercial establishments. The permit, however, was challenged by PWV residents and neighbors. The challengers focused on the claim that "open space," as that term is defined in the Zoning Resolution, had to be "accessible to and usable by all persons occupying a dwelling unit or a rooming unit on the zoning lot" (ZR § 12-10). The dispute arose because the roof garden at 808 Columbus, which would only be accessible to its residents, was included in the calculation of open space required under the Zoning Resolution. The open space for the roof garden totaled 42,500 square feet. The exclusive roof garden would have a 70-foot saltwater pool inlaid with mosaic tiles, a sundeck, and a lawn. Stating the obvious, the residents of 808 Columbus would have the benefit of the exclusive roof garden, and, additionally, have access to, and use and enjoyment of, the zoning lot's open space used by the PWV residents. On the other hand, PWV residents would merely have access to the general open space, but not be permitted to share in the use and enjoyment of the exclusive 808 Columbus roof garden. Without inclusion of the roof garden in the calculation, the required minimum open space would not be met, and the project would not receive a construction permit, effectively terminating the 808 Columbus project. Over strenuous opposition from residents, community leaders, and elected officials, DOB approved the inclusion of the roof garden in the open space calculation, and granted the permit needed to build 808 Columbus. BSA affirmed the decision to grant the permit by resolution dated February 3, 2009 (2009 Resolution).
In reaching its decision in the 2009 Resolution, BSA relied on and accepted DOB's assertion "that ZR §§ 23-14 and 23-142 require open space with respect to a building, rather than to the zoning lot as a whole, and therefore [is] satisfied by the Permit application which provides the required amount of open space to each building on the Zoning Lot" (emphasis added). In other words, DOB used, and BSA approved, a building-by-building methodology to calculate the open space ratio for 808 Columbus given that "ZR § 12-10 definition of open space' does not specify that open space on a multiple building dwelling lot must be common, centralized space that is shared by all occupants of the zoning lot" (emphasis added). Indeed, in using this approach, DOB and BSA agreed with Owner's claim that "neither ZR §§ 12-10, 23-14, nor any other provision of the Zoning Resolution, expressly concerns a condition involving multiple [*4]buildings on a zoning lot, nor requires that open space on a multi-building zoning lot be shared space that is commonly accessible to all occupants of a zoning lot." In reaching its final determination, BSA noted,
"[A]s each of the existing buildings is allocated an amount of open space that is in excess of that which would be required under the Zoning Resolution if they were located on separate zoning lots, it cannot be seen how those residents would be deprived of an equitable share of open space by the proposed building."
Based on the foregoing, BSA "agree[d] that the open space proposed for the subject site [of 240,331 square feet] does not violate the open space requirements of the Zoning Resolution," and found "that the proposed open space complies with the requirements of ZR §§ 23-142 and 12-10." The challengers commenced a CPLR article 78 proceeding, but ultimately settled the matter and construction of 808 Columbus proceeded to completion.
The construction of 808 Columbus did not put an end to the dispute. In February 2011, two years later, the New York City Council enacted CPC's proposed amendments to the Zoning Resolution. Among the amendments were significant changes to the following five sections of the Zoning Resolution involving open space calculations that have a direct bearing on the instant dispute: section 12-10, defining "open space ratio"; section 23-14, establishing the minimum required open space or open space ratio; section 23-141, prescribing the maximum required open space or open space ratio, the maximum lot coverage and the maximum floor area for non-profit residences for the elderly in certain zoning districts; section 23-142, establishing the maximum required open space ratio, the maximum floor area ratio and corresponding height factor in certain zoning districts; and section 23-143, prescribing the minimum required open space ratio in certain zoning districts with certain associated height factors. In each of these amended sections of the Zoning Resolution, the City Council changed the language of these statutes by deleting the words "building" and "any buildings," and in their place substituted the words "zoning lot" and "all zoning lots."[FN5]
The open space dispute has resurfaced. Subsequent to the 2011 amendments, in late 2011, Owner sought to utilize the parcel of land that was formerly a parking lot (parking lot) used by the PWV residents, located at 125 West 97th Street on PWV's zoning lot. In furtherance of this effort, Owner executed an agreement with JHL to exchange the parking lot for JHL's parcel of land located on West 106th Street. This parcel, unlike the parking lot parcel of land, would be large enough for Owner to construct another luxury apartment building. In turn, JHL would receive $35 million and would build a 20-story nursing home building (JHL building) on the parking lot. JHL is not presently the title owner of the parking lot. Instead, it is party to an Exchange Agreement concerning the parking lot and its current West 106th Street property. The Exchange Agreement is conditioned on, among other things, JHL obtaining a permit from DOB for the JHL building.
The JHL building would be a state-of-the-art eldercare facility operated under an innovative model of long-term care called "The Green House" model. Unlike traditional nursing home settings, this model provides each resident with a personal living environment, stressing independence while at the same time allowing for enhanced interaction with staff. In that regard, The Green House model creates a series of small "homes" containing up to 12 elders and staff members, with each home organized to function independently, and staffed with a self-managed work team that would provide the full range of personal care and clinical services of a traditional nursing home. As the first Green House high-rise in a major metropolitan setting and the single largest eldercare capital project in the City, this facility seeks to address the needs of a rapidly aging population.
A brief discussion of the scope of the JHL building and its impact on the open space is in order. According to JHL's March 29, 2011 application, the zoning lot at that time contained 240,331 square feet of open space, which exceeded the required minimum open space of 230,108 for the zoning lot by 10,223 square feet. JHL proposed 230,726 square feet of open space for the zoning lot, arguably 618 square feet in excess of the required minimum open space of 230,108 square feet. The JHL building would be 275 feet high, and use up to 20,036 square feet of open space. Of this amount, 10,431 square feet would be an accessible roofed garden, which would appear to result in a net loss of open space in the amount of 9,605 square feet. In its March 29, 2011 DOB application, JHL indicated that the 9,605 square feet did not amount to an open space deficit when applied to the excess open space square footage of 10,223 [FN6]. Perhaps recognizing the [*5]sensitive and controversial history of open space for this zoning lot, and anticipating a community outcry reminiscent of the 808 Columbus dispute, JHL's DOB application proposed that the JHL building's covered roof, a children's play area, and the Meditation Garden would be "accessible to and usable by all persons occupying a dwelling unit ... on the zoning lot."
DOB approved JHL's first application for a roofed open space for the JHL building. It conditioned its approval as follows:
"The request to confirm that the proposed roofed "open space" conforms to the definition of open space as per section 12-10 ZR is hereby approved with the following conditions:
"1. the entire open space including the covered roofed area that is used to meet the requirements of ZR 12-10 "Open Space" shall be accessible and usable to all persons occupying the residential units on the zoning lot at all times; . . ."
JHL's second zoning application sought approval of the children's play area and the Mediation Garden, areas on the zoning lot that would be considered as open space. DOB conditioned its approval as follows:
"With respect to the applicant's stated proposal that the "child's play area" and "Meditation Garden" ... will be fenced and entry to these spaces will be controlled as every resident of the zoning lot will be provided with a card key to access these spaces, the applicant is correct that such arrangement does not violate the requirement that "open space" be "accessible to and usable by all persons occupying a dwelling unit on the zoning lot.'"
Petitioners, frustrated with what they perceived to be overdevelopment of PWV and the Upper West Side, objected to the permit for the JHL building, and argued, among other things, that the JHL building would violate the Zoning Resolution's open space mandate. Over their objections, on December 4, 2013, DOB granted JHL's permit application to construct the JHL building. Petitioners appealed DOB's decision to the BSA. After holding a public hearing, BSA found that the proposed construction met the requirements for open space under ZR §§ 12-10 and 23-14, and adopted a resolution on August 18, 2015 denying the appeal.
In affirming DOB's grant of the permit for the JHL building, BSA disagreed with petitioners "that constructing a community facility building that does not require open space affects the open space requirement on a site which also contains residential buildings (which do have an open space requirement) where, as here, the site contains the minimum open space required." In arriving at its determination, BSA referred to the 2009 Resolution, which used the building-by-building methodology, and stated that
"the Board and the DOB concluded that in the case of a multi-building zoning lot, the open space definition could be read to allow some open space to be reserved for the [*6]residents of a single building as long as the residents of each building on the zoning lot have access to at least the amount of open space that would be required under ZR § 23-142 if each building were on separate zoning lots."
BSA concluded "that because the definition of open space itself has not changed and because the CPC did not intend to change the open space requirement, subsequent to the 2009 Appeal, [the 2011 amendments] do not dictate any change in the Board's or DOB's analysis since the prior appeal." BSA pointed out that "the text was amended in 2011, after the 2009 Appeal and CPC had an opportunity to clarify an intent to restrict the open space."
Petitioner commenced the instant article 78 proceeding against BSA, JHL and Owner seeking to annul the 2015 Resolution and to revoke DOB's permit for the JHL building. Again, as they did in the challenge to 808 Columbus and the 2009 resolution, petitioners contend that the 42,500 square feet roof garden at 808 Columbus can no longer be considered open space, and, as such, cannot be included when calculating the required open space for the zoning lot. They argue that even if the roof garden was arguably within the meaning of open space, and in compliance with ZR §§ 23-14 and 23-142 when 808 Columbus was constructed in 2009, the roof garden presently does not fall within the definition of open space. Petitioners assert that the 2011 amendments eliminated any claimed ambiguity in the interpretation of what constitutes open space under ZR §§ 23-14 and 23-142, and that pursuant to these amendments the 808 Columbus roof garden should not be included in determining the JHL building's open space ratio. Petitioners argue that without 808 Columbus's roof garden the JHL building's open space ratio of 230,726 square feet would fall below the required minimum open space ratio of 230,108 square feet. As a consequence, petitioners assert that DOB's permit for the JHL building must be revoked, which would put an end to the construction of the JHL building.
Supreme Court denied the petition and dismissed the proceeding. In deciding in favor of respondents, Supreme Court noted that petitioners were not challenging the decision with respect to 808 Columbus and its open space ratio. As to whether 808 Columbus's open space should be included in calculating the JHL building's open space ratio, respondents put forth the argument that the open space definition of "accessible" and "usable" by all persons on the zoning lot could not be reconciled with the definition of "zoning lot," which contemplated multiple buildings on a single zoning lot, as in the present case. Thus, respondents argued that they were free to interpret and reconcile this ambiguity, and, accordingly, arrived at a methodology that employed a building-by-building analysis to calculate the open space ratio for a zoning lot containing multiple buildings. Supreme Court agreed and found that it could not say that "the open space provisions could not be subject to different interpretations." As such, it concluded that there was "enough ambiguity to defer to DOB's practical construction of the ordinance.'" Nonetheless, in arriving at this conclusion, Supreme Court expressed serious reservations of respondents' building-by-building methodology, and was
"not convinced that, as respondents assert, the goal of the Zoning Resolution's open space provisions ... is to ensure that all persons residing in a residential building have access to an amount of open space that is commensurate with the size of the building and the square footage of the parcel on which it stands'"
or "that the ZR intended to treat multi-building zoning lots differently than single-building zoning lots when considering open space requirements." We now reverse.
Respondents raise the following threshold issues: statute of limitations and collateral estoppel. We reject respondents' argument that this proceeding is time-barred. The instant challenge was brought within four months after the 2015 Resolution became final and binding (see CPLR 217[1]).
We also decline to apply the doctrine of collateral estoppel to bar this article 78 proceeding. The doctrine is a flexible one, and is applied more flexibly in the context of the determinations of administrative agencies (Jeffreys v Griffin, 1 NY3d 34, 40 [2003]). Two requirements must be met before the equitable doctrine of collateral estoppel may be invoked. First, there must be identity of parties, and identity of issues that were decided in the prior action and decisive of the present action (Ryan v New York Tel. Co., 62 NY2d 494, 500 [1984]). Second, there must have been a full and fair opportunity to contest the decision now said to be controlling (id. at 501). These formal prerequisites are merely a framework for a court to use in conducting a fundamental inquiry of whether litigation should be permitted in a particular case in light of what are often competing policy considerations, fairness to the parties, conservation of judicial resources, and the societal interests in consistent and accurate results (Staatsburg Water Co. v Staatsburg Fire Dist., 72 NY2d 147, 153 [1988]).
Notwithstanding some of petitioners' connections to the prior administrative proceeding concerning the 2009 Resolution and the similar legal theory raised in the prior proceeding concerning the same zoning lot, these similarities do not justify invocation of the collateral estoppel doctrine. The instant petitioners are challenging the grant of a permit for a different building on the zoning lot, and rely on amendments to relevant provisions of the Zoning Resolution enacted subsequent to BSA's 2009 Resolution, the prior final determination (see Green v Santa Fe Indus., 70 NY2d 244, 253-254 [1987]). Indeed, those were the central issues set forth in the 2015 Resolution, which BSA found in favor of Owner and JHL when it determined that 808 Columbus' open space allotment could be used in analyzing the open space for JHL. Recognizing the flexible and equitable nature of the doctrine, we cannot overlook the fact that due to the importance of the facts and realities of this matter, and the potential impact this appeal would have upon development in the City, the doctrine cannot be used to preclude petitioners from litigating the instant matter.
The parties do not dispute that 808 Columbus's open space of 42,500 square feet is grandfathered under the Zoning Resolution. Petitioners are not seeking to change the status of that building. There is also no dispute that including 808 Columbus's open space allotment in the JHL analysis would yield for the JHL building an open space figure of 230,726 square feet, 618 square feet above the required minimum open space of 230,108. In arriving at the open space allotment of 230,726 square feet, there would be a reduction of 9,605 square feet of open space from the excess open space of 10,223 square feet. In the end, although the JHL building's open space is above the required minimum open space by 618 square feet, there would nonetheless be a substantial open space reduction. There is also no dispute that if 808 Columbus's open space allotment of 42,500 square feet were removed from the JHL open space analysis the JHL building would not satisfy the required minimum open space, and would violate the Zoning Resolution. As such, the issue is straightforward  whether under the 2011 amendments DOB and BSA can count 808 Columbus's exclusive roof garden's open space square footage of 42,500 in determining the zoning lot's required minimum open space so as to permit the construction of the JHL building (see Matter of McDonald v Zoning Bd. of Appeals of Town of Islip, 31 AD3d 642 [2d Dept 2006] ["A use of property that existed before the enactment of a zoning restriction that prohibits the use is a legal nonconforming use, but the right to maintain a nonconforming use does not include the right to extend or enlarge that use"]).
The basic principle of administrative law is that the interpretations of a statute by an agency charged with its implementation are entitled to judicial deference and may not be set aside unless shown to be unreasonable or irrational (see Matter of New York State Assn. of Life Underwriters v New York State Banking Dept., 83 NY2d 353, 359-360 [1994]). Further, as is relevant to this appeal, courts have consistently recognized the pivotal role of BSA's review of DOB determinations (see Matter of Delafield 246 Corp. v Department of Bldgs. of City of N.Y., [*7]218 AD2d 613, 614 [1st Dept 1995]; see also Matter of Toys "R" Us v Silva, 89 NY2d 411, 418-419 [1996] ["the BSA's interpretation of the [Zoning Resolution's] terms must be given great weight and judicial deference so long as the interpretation is neither irrational, unreasonable nor inconsistent with the governing statute"] [internal quotation marks omitted]). With this framework in mind, we review DOB's and BSA's decision to use a building-by-building approach in a multi-building zoning lot.
In the 2009 Resolution, BSA determined that the open space requirement of ZR §§ 12-10 and 23-14 were not violated by reserving 808 Columbus' roof garden for the exclusive use of its residents. BSA found that DOB's application of a building-by-building analysis in the open space ratio calculation was proper given its finding that there was an ambiguity between the definition of open space (ZR § 12-10), and the requirement of open space with respect a multi-building zoning lot (ZR §§ 23-14 and 23-142)[FN7]. Indeed, in the 2009 Resolution, BSA concluded that
"as each of the existing buildings is allocated an amount of open space that is in excess of that which would be required under the Zoning Resolution if they were located on separate zoning lots, it cannot be seen how those residents would be deprived of an equitable share of open space by the proposed building."
Thus, the 2009 Resolution utilized for the first time the building-by-building methodology in calculating the open space ratio for a zoning lot consisting of multiple buildings, nearly 30 years after the 1977 amendment to the zoning lot definition in which "open space" and "zoning lot" coexisted during that period without incident until the 808 Columbus dispute.[FN8]
In the present dispute, Owner and JHL repeatedly assert that a reading of the 2011 amendments demonstrates that the City Council did not eliminate the ambiguity between open space and a multi-building zoning lot when it removed the term "building" and replaced it with "zoning lot." Indeed, DOB and BSA agreed with Owner and JHL's statutory interpretation. By [*8]accepting this interpretation, DOB and BSA enabled themselves to continue to apply the building-by-building methodology to the JHL open space calculation so as to include the 808 Columbus open space square footage. As further support for their reading, respondents point to the absence of any legislative history addressing and criticizing DOB and BSA's finding that an ambiguity exists, particularly given the City Council's and CPC's awareness of the 2009 Resolution and its controversy. This conclusion does not end the inquiry. The question that remains is whether DOB and BSA properly interpreted the definition of open space within the context of a multi-building zoning lot under the 2011 amendments in calculating the zoning lot's required minimum open space so as to grant the construction permit for the JHL Building.
Petitioners claim that the 2011 amendments to ZR §§ 23-14 and 23-142 made clear that the open space calculation and determination are to be conducted based on the entire zoning lot as a whole, and not on a building-by-building basis [FN9]. Thus, petitioners contend the 2011 amendments removed the contextual basis upon which BSA relied on when it determined that open space does not have to be accessible to all residents of a zoning lot. As such, they argue that 808 Columbus's open space ratio of 42,500 square feet cannot be included in the JHL building's analysis of open space, and that without it the JHL building will not be in compliance with the open space ratio for the zoning lot. We agree.
An administrative agency's interpretation of a statute is typically entitled to deference (see Matter of Smith v Donovan, 61 AD3d 505, 508-509 [1st Dept 2009], lv denied 13 NY3d 712 [2009]). BSA's interpretation of the Zoning Resolution's terms must be given great weight and judicial deference, particularly where the interpretation involves specialized "knowledge and understanding of underlying operational practices or entails an evaluation of factual data and inferences to be drawn therefrom," provided that the interpretation is neither irrational, unreasonable nor inconsistent with the governing statute (Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal, 5 NY3d 303, 312 [2005] [internal quotation marks omitted]; see also Toys "R" Us v Silva, 89 NY2d at 418-419). Where, however, the question is one of pure statutory interpretation " dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency and its interpretative regulations are therefore to be accorded much less weight'" (KSLM-Columbus Apts., Inc., 5 NY3d at 312, quoting Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459 [1980]). In the latter case, "courts are free to ascertain the proper interpretation from the statutory language and legislative intent (Matter of Smith v Donovan, 61 AD3d at 508-509 [internal quotation marks omitted]; Matter of Raritan Dev. Corp. v Silva, 91 NY2d 98, 102 [1997] [deference to BSA is not required because the question is one of pure legal interpretation of statutory terms]. Clearly, resolution of this dispute as it concerns the 2011 amendments does not implicate DOB's and BSA's knowledge and understanding of operational practices or entail an evaluation of factual data and inferences to be drawn therefrom. The resolution is one of pure statutory reading and analysis. We are, therefore, not bound by DOB's and BSA's interpretation, nor are we required to give their interpretation deference.
The language in ZR § 12-10 is "clear and unambiguous" (Matter of Beekman Hill Assn. v [*9]Chin, 274 AD2d 161, 167 [1st Dept 2000], lv denied 95 NY2d 767 [2000]). ZR § 12-10 has always defined "open space" as being "accessible to and usable by all persons occupying a #dwelling unit# or a #rooming unit# on the #zoning lot#" [emphasis added]. That language unambiguously requires open space to be accessible to all residents of any residential building on the zoning lot, not only the building containing the open space in question. To further bolster our finding that this language is clear and unambiguous, the 2011 amendments to ZR §§ 23-14 and 23-142 eliminated all references to "building" and replaced it with "zoning lot." Equally dispositive is the identical change in the definition of "open space ratio" in ZR § 12-10. Of course, the impracticality of allowing the residents of one building on a zoning lot to have access to, and use of, open space located on the rooftop of another building on the zoning lot is obvious. Yet, respondents' apparent contention concerning ZR § 12-10's open space requirement  that any rooftop that may be considered open space for the purposes of the open space requirement shall or must be considered open space irrespective of access  gives credence to the impracticality. That is not what ZR § 12-10 says.
ZR § 12-10 unambiguously provides that "[o]pen space may be provided on the roof of . . . [a] building containing residences" and that "[a]ll such roof areas used for open space shall meet the requirements set forth in this definition." Thus, any rooftop space that is to be considered open space for the purposes of satisfying the open space requirement under the Zoning Resolution must be accessible and usable by all residents on a zoning lot. Lest there be any doubt, we find that the 2011 amendments now preclude the use of the building-by-building methodology, which had been an exception to this clear statutory import.
The argument that the 2011 amendments' legislative history indicates that there was no intent to alter the use of the building-by-building methodology in calculating the open space ratio is arguably correct. To be sure, CPC's report concerning the 2011 Amendments makes no mention whatsoever of the Zoning Resolution's open space requirements and the proper methodology to be used under the circumstances we have here even though it had the benefit of the 2009 Resolution and the 808 Columbus controversy. Legislative history, however, should not be confused with legislative intent, as the two are not coextensive with each other (see Sega v State of New York, 60 NY2d 183, 190 [1983]). When a statute's language is clear, resort to extrinsic evidence to glean the legislature's intent is not necessary (see New York State Bankers Assn. v Albright, 38 NY2d 430, 436 [1975]; see e.g. People v Graham, 55 NY2d 144, 151 [1982]).
The absence of any legislative history concerning the 2011 Amendments' elimination of "building," and replacing the term with "zoning lot," cannot not be deemed an acceptance of the building-by-building methodology, particularly where the new statutory language is clear and unambiguous. That change was fundamental because it was an unmistakable rejection of the utilization of a building-by-building formula in calculating the open space ratio for a multiple building zoning lot. Inasmuch as the legislative intent is apparent and unambiguous from the noted amendatory language, there is no occasion to consider the import, if any, of the absence of any extrinsic evidence, i.e., legislative history. Thus, the 2009 Resolution's rationale that "in the case of a multi-building zoning lot, the open space definition could be read to allow some open space to be reserved for the residents of a single building as long as the residents of each building on the zoning lot have access to at least the amount of open space that would be required under ZR § 23-142 if each building were on separate zoning lots" is no longer sustainable. We, therefore, hold that DOB and BSA's use of a building-by-building formula in calculating the JHL building's open space ratio to be contrary to the Zoning Resolution, and, as such, DOB's permit to JHL should be revoked.
Accordingly, the judgment (denominated decision/order) of the Supreme Court, New [*10]York County (Joan Lobis, J.), entered August 9, 2016, denying the petition seeking to annul a resolution of respondent New York City Board of Standards and Appeals, dated August 18, 2015, which upheld a decision of the New York City Department of Buildings that granted a permit to respondent Jewish Home Lifecare, Inc. for the construction of a nursing home, and dismissing the proceeding brought pursuant to CPLR article 78, should be reversed, on the law, without costs, and the petition granted to the extent of annulling the resolution and denying the permit.
All concur except Tom, J. who dissents in an Opinion.




TOM, J. (dissenting)


The 2015 resolution of the New York City Board of Standards and Appeals (BSA) to uphold a decision of nonparty New York City Department of Buildings (DOB) that granted respondent Jewish Home Lifecare (JHL) a permit to build a 20-story nursing home in the Upper Westside of Manhattan has a rational basis and was not arbitrary and capricious. Accordingly, I dissent.
This article 78 proceeding is another episode in the long running battle over a controversial project on Manhattan's Upper West Side. Specifically, whether JHL, a nonprofit corporation, may build its proposed nursing home on an area owned by respondent PWV Acquisition, L.L.C. (the Owner) and formerly used as a parking lot for Park West Village (PWV) residents, located on the south side of a zoning lot consisting of a "superblock" bounded by West 100th Street on the north, West 97th Street on the south, Amsterdam Avenue on the west, and Columbus Avenue on the east. The zoning lot contains the PWV residential apartment buildings.
This proceeding was originally brought in 2015 by Maggi Peyton, a resident of PWV, in opposition to the nursing home project. She died on October 26, 2016 and by order entered April 6, 2017, this Court granted a cross motion to the extent of, inter alia, deeming her son, Randy Peyton, as petitioner; granting 13 other PWV residents leave to intervene; and amending the caption on this appeal to name Randy Peyton as petitioner and the others as intervenors-petitioners.
Also in 2015, separate article 78 proceedings were brought by various individuals and organizations to challenge the separate determination of the New York State Department of Health (DOH) to approve JHL's application to construct the nursing home, arguing that DOH failed to comply with the requirements of the State Environmental Quality Review Act (SEQRA). This Court denied the petitions and dismissed those separate proceedings (see Matter of Friends of P.S. 163, Inc. v Jewish Home Lifecare, Manhattan, 146 AD3d 576 [1st Dept 2017], affd 30 NY3d 416 [2017]).
Some background information is pertinent to this proceeding. In 2007, nonparty DOB issued a permit to the Owner or its affiliates to build a 20-story building at 808 Columbus Avenue in the zoning lot, with the ground floor containing commercial space including a Whole Foods Market, and the upper floor containing residential units. JHL's proposed nursing home would be built on the same zoning lot as 808 Columbus.
The office of the Manhattan Borough President submitted a written objection to the permit for 808 Columbus, claiming, among other things, that 808 Columbus would violate requirements under the Zoning Resolution (ZR) to provide sufficient "open space." DOB's Manhattan Borough Commissioner denied that objection, finding that "the ZR does not specify that open space on a multiple[-]building zoning lot must be shared space that is commonly accessible to all occupants of the zoning lot."
Some PWV residents and government officials appealed from DOB's approval of the permit, contending, among other things, that the proposed rooftop space on 808 Columbus would [*11]violate the requirement for "open space" under ZR § 12-10, since that space was accessible only to residents of 808 Columbus and not residents of other buildings on the zoning lot.
ZR § 12-10 defines "open space" as "that part of a zoning lot, including courts or yards, which is open and unobstructed from its lowest level to the sky and is accessible to and usable by all persons occupying a dwelling unit or a rooming unit on the zoning lot" (emphasis omitted). However, it explicitly provides:
"Open space may, however, include areas covered by roofs, the total area of which is less than 10 percent of the unroofed or uncovered area of a zoning lot, provided that such roofed area is not enclosed on more than one side, or on more than 10 percent of the perimeter of the roofed area, whichever is greater" (id. [emphasis omitted]).
ZR § 12-10 allows open space to "be provided on the roof of" a "community facility building" or, with some limitations, a residential or non-residential building (id. [emphasis omitted]).
The "open space ratio" determines the minimum amount of open space that must exist on a zoning lot. The open space ratio is defined as "the number of square feet of open space on the zoning lot, expressed as a percentage of the floor area on that zoning lot" (id. [emphasis omitted]). ZR § 12-10 explains:
"For example, if for a particular zoning lot an open space ratio of 20 is required, 20,000 square feet of floor area in the building would necessitate 4,000 square feet of open space on the zoning lot; or, if 6,000 square feet of lot area were in open space, 30,000 square feet of floor area could be on that zoning lot" (id.).
As of 2009, ZR § 23-14 provided that "for any building on a zoning lot, the minimum required open space or open space ratio shall be not less than set forth in this Section" ([emphasis omitted]); ZR § 23-142 provided that "the minimum required open space ratio . . . for any building on a zoning lot" in the R7 District shall be as set forth in the statute. On February 3, 2009, respondent BSA adopted a resolution that denied the appeal from DOB's approval of the permit for 808 Columbus. BSA upheld DOB's determination that 808 Columbus complied with the open space requirements, rejecting the argument that the open space on the building's rooftop was exclusively accessible to residents of 808 Columbus. BSA found that "the purported intent of the Zoning Resolution is not clearly stated," and noted that the definition of open space in ZR § 12-10 "does not specify that open space on a multiple building zoning lot must be common, centralized space that is shared by all occupants of the zoning lot."
BSA also relied on DOB's observation that no provision of the ZR "expressly concerns a condition involving multiple buildings on a zoning lot, nor requires that open space on a multi-building zoning lot be shared space that is commonly accessible to all the occupants of a zoning lot."[FN1] Moreover, BSA agreed with DOB's argument that "the definition of open space must be [*12]read in the context of the calculation of open space set forth in ZR §§ 23-14 and 23-142, which require a minimum amount of open space with respect to any building' on a zoning lot, rather than to all buildings on a zoning lot."
BSA also concluded that the 808 Columbus proposal complied with the open space requirements, since "each of the existing buildings is allocated an amount of open space ... in excess of that which would be required under the [ZR] if they were located on separate zoning lots," and the exclusive rooftop space at 808 Columbus accordingly did not deprive any zoning lot residents' of their right to "an equitable share of open space" merely because they lived in buildings on the same lot as 808 Columbus.
Another article 78 proceeding was brought in New York County Supreme Court by various officials and others, challenging the 2009 Resolution. However, that case settled in July 2009 and was dismissed with prejudice (Bunten v Board of Stds. & Appeals of the City of N.Y., Sup Ct, NY County, Gische J., Index No. 102750/09). 808 Columbus building was subsequently built and completed.
On February 2, 2011, the City Planning Commission (CPC) amended the ZR. Some of the sections addressing the calculation of open space were amended so that references to a "building" or a "building on a zoning lot" were replaced with the term "zoning lot." In particular, § 23-14 was amended to provide, in general, that "for any zoning lot" (previously "building") "the minimum required open space or open space ratio shall be not less than set forth in this Section" [emphasis added], and ZR § 23-142 was amended to state that "the minimum required open space ratio ... for any zoning lot" (previously "building") in the R7 District "shall be as set forth in the following table for zoning lots with the height factor indicated in the following table" ([emphasis added]). The specific examples of the "open space ratio" were amended to add the following underlined words and delete the struck-through words:
"For example, if for a particular building zoning lot an open space ratio of 20 is required, 20,000 square feet of floor area in the building would necessitate 4,000 square feet of open space on the zoning lot upon which the building stands; or, if 6,000 square feet of lot area were in open space, 30,000 square feet of floor area could be in the building on that zoning lot."
The definition of "open space ratio" was not otherwise amended, nor was the definition of "open space" in ZR § 12-10.
In December 2013, DOB granted JHL's application for a permit to build the nursing home in the zoning lot. Significantly, at the time of the proposal, the zoning lot had an excess of open space of 10,223 square feet. While the proposal would reduce the amount of excess open space, it would still have approximately 618 square feet in excess of the minimum open space of 230,108 square feet. JHL's application specifically proposed that the covered roof on JHL's building, as well as a children's play area and Meditation Garden would be "accessible to and usable by all persons occupying a dwelling unit on the zoning lot." In fact, DOB conditioned its approval of the project with the requirement that the covered roof, play area and garden be accessible to all persons occupying residential units on the zoning lot at all times in compliance with the 2011 ZR amendments.
However, a written objection was submitted by the original petitioner, Maggi Peyton and others to the issuance of the permit. DOB's Deputy Commissioner found the objection untimely, but also rejected it on the merits by letter dated November 10, 2014. The original petitioner, among others, appealed from the approval, arguing that the 2011 amendments changed the open [*13]space requirements under the ZR, with which JHL failed to comply. She argued that because of the amendments open space now must be accessible to all residents of all buildings on the zoning lot in question. Since the rooftop of 808 Columbus, completed before the 2011 amendments, was not accessible to any of the Zoning Lot residents other than 808 Columbus residents, she contended that it no longer qualified as open space.
In April 2015, BSA received written comments and held a public hearing on the challenge to JHL's 2013 permit approval. PWV residents testified in support of petitioner, as did local and public officials, and others. In addition, three BSA members personally examined the nursing home site and the surrounding neighborhood.
On August 18, 2015, BSA adopted a Resolution denying petitioner's appeal. BSA found that the 2011 amendments did not amend the open space requirements or otherwise affect the propriety of the 2009 Resolution, given that the definition of "open space" in ZR § 12-10 had not been amended. Since petitioner "ha[d] not presented any new information that would require a different result than the 2009 [Resolution]," BSA adhered to its 2009 holding in 808 Columbus "that in the case of a multi-building zoning lot, the open space definition could be read to allow some open space to be reserved for the residents of a single building as long as the residents of each building on the zoning lot have access to at least the amount of open space that would be required under ZR § 23-142 if each building were on separate zoning lots." Therefore, considering that the nursing home "does not require additional open space," BSA found the nursing home did not "disturb[] the existing open space calculations for the entire site" or otherwise violate the open space requirements.
In particular, BSA found that the nursing home would consist of a total of 20,036 square feet, of which 10,431 square feet would count as open space - far more than the open space ratio required by the ZR - and the rooftop space at 808 Columbus deemed open space in the 2009 Resolution is 42,500 square feet. Critically, the open space provided by the nursing home plans would ensure that residents of the nursing home have access to more than the amount of space that would be required if the home were on its own lot, and the project would not disturb the open space available to other residents on the zoning lot. Further, the open space required for the zoning lot is 230,108 square feet and "the total open space provided by the lot," under BSA's findings in the 2009 and 2015 Resolutions, was 230,726 square feet, about 600 square feet more than the minimum requirement. Thus, the open space requirements would not be met if the 42,500-square-foot rooftop space of 808 Columbus did not qualify as open space.
Petitioner brought this article 78 proceeding against BSA, JHL, and the Owner, seeking to annul the 2015 Resolution based on the ground that the rooftop area of 808 Columbus should now not qualify as open space, and to revoke the permit for the nursing home issued by DOB to JHL. Supreme Court concluded that it "cannot say that the open space provisions could not be subject to different interpretations," and that there was "enough ambiguity" in the open space provisions so that the court would "defer to DOB's practical construction of the ordinance." In particular, the court stated:
"The key text amendments, while undisputedly clarifying that the amount of required open space must be based on the zoning lot as a whole, do not modify, clarify, or otherwise address the definition of open space or what counts as open space; and the court finds no basis in the 2011 amendments to revisit BSA's 2009 interpretation of open space or determination that 808 Columbus's rooftop space satisfies the open space requirements of the Zoning Resolution. Even if, as petitioner asserts, the key text amendments to ZR §§ 23-14 and 23-142 undercut BSA's reliance on the pre-2011 language of those sections to support its conclusion that open space can be allocated among individual buildings on a multi-building zoning lot, the 2011 amendments do not unambiguously alter the meaning or measurement of open space as interpreted by BSA."
The court thus found the BSA's 2015 Resolution to be rational and therefore denied the petition and dismissed the proceeding. I would affirm.
Initially, it must be noted that petitioners do not actually challenge whether the 2015 approved nursing home - the project at issue here - complies with the ZR. In fact, the nursing home will have no practical effect on the zoning lot's compliance with open space requirements, as it neither increases the overall amount of open space needed for the lot as a whole nor displaces existing open space needed to comply with the ZR. Indeed, half of the nursing home's square footage consists of open space, and the DOB conditioned its approval of the project on that open space being accessible to all residents of the zoning lot. Further, the zoning lot as a whole would still have in excess of the minimum open space required. Thus, the proposed nursing home project purported to be in issue in this proceeding is in full compliance with the 2011 ZR.
Instead, in a bid to halt the nursing home project, petitioners are attempting to resurrect and collaterally attack the 2009 resolution determining that 808 Columbus complied with open space requirements. Such line of argument is not only belated but is also foreclosed by the settlement of the 2009 article 78 proceeding, which was then dismissed with prejudice more than six years earlier (see Ryan v New York Tel. Co., 62 NY2d 494, 499 [1984]["the doctrines of res judicata and collateral estoppel are applicable to give conclusive effect to the quasi-judicial determinations of administrative agencies "]). The time to challenge that resolution has expired (see Administrative Code of City of NY § 25-207[a]; 2 RCNY 1-12.7; see also CPLR 217[1]). In other words, petitioners are bound by the 2009 Resolution and cannot now re-litigate whether 808 Columbus's roof complies with open space requirements in relation to the present proposed project. Nor should we permit them to challenge that earlier resolution, a challenge was completed and foreclosed, by raising it in this proceeding concerning an entirely different project which is in full compliance with the 2011 ZR.
Based on the ZR at the time of the 2009 Resolution, there was a rational basis to conclude that 808 Columbus complied with open space requirements. As the BSA stated, the definition of open space in ZR § 12-10 "does not specify that open space on a multiple building dwelling lot must be common, centralized space that is shared by all occupants of the zoning lot" and no provision of the ZR "expressly concerns a condition involving multiple buildings on a zoning lot, nor requires that open space on a multi-building zoning lot be shared space that is commonly accessible to all the occupants of a zoning lot." BSA rationally found that "the definition of open space must be read in the context of the calculation of open space set forth in ZR §§ 23-14 and 23-142, which [in 2009] require[d] a minimum amount of open space with respect to any building' on a zoning lot, rather than to all buildings on a zoning lot."
It was also rational for BSA to find that the 808 Columbus proposal complied with the open space requirements, since "each of the existing buildings is allocated an amount of open space ... in excess of that which would be required under the [ZR] if they were located on separate zoning lots," and the exclusive rooftop space at 808 Columbus accordingly did not deprive any zoning lot residents' of their right to "an equitable share of open space" merely because they lived in buildings on the same lot as 808 Columbus.
Moreover, to the extent the 2011 amendments changed the open space requirements, this could only apply prospectively as a retroactive application of these changes could potentially cause havoc throughout the City as a multitude of challenges might be commenced against buildings that formerly complied with the pre-2011 ZR. Therefore, even if 808 Columbus were deemed a non-compliant building, which it is not, such noncompliance would be deemed legal and may continue (see ZR §§ 52-11, 54-11, 54-31).
As the Court of Appeals held in Glacial Aggregates LLC v Town of Yorkshire (14 NY3d 127, 135 [2010]), "nonconforming uses or structures, in existence when a zoning ordinance is [*14]enacted, are, as a general rule, constitutionally protected and will be permitted to continue, notwithstanding the contrary provisions of the ordinance" [internal quotation marks omitted].
Even assuming arguendo that petitioners' argument is not precluded entirely, it fails on the merits.
It must be stated at the outset that the role of this Court in reviewing the determination of BSA is narrowly prescribed. Our review is simple and deferential. Specifically, where, as here, the relevant provisions of the ZR are ambiguous, and the BSA has rationally interpreted them, it is not for this Court to dictate a result other than the one reached by the very agency with the expertise in zoning, and which is tasked with resolving these concerns, in this complex city inhabited by many competing interests.
It is fundamental, as even the majority notes, that "The BSA, comprised of five experts in land use and planning, is the ultimate administrative authority charged with enforcing the Zoning Resolution . . . Consequently, in questions relating to its expertise, the BSA's interpretation of the statute's terms must be given great weight and judicial deference, so long as the interpretation is neither irrational, unreasonable nor inconsistent with the governing statute'" (Matter of Toys "R" Us v Silva, 89 NY2d 411, 418-419 [1996][internal quotation marks omitted]).
The proper standard of review is whether there is a rational basis for BSA's determination or the action complained of is arbitrary and capricious (Matter of Peckham v Calogero, 12 NY3d 424, 431 [2009]; Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974]). If we find that the determination is supported by a rational basis, we must sustain the determination even if the court concludes that it would have reached a different result than the one reached by the agency (Peckham, 12 NY3d at 431). Further, courts must defer to an administrative agency's rational interpretation of its own regulations in its area of expertise (id.) unless the question is pure legal interpretation of statutory language that is unambiguous (see Matter of Beekman Hill Assn. v Chin, 274 AD2d 161, 167 [1st Dept 2000], lv denied 95 NY2d 767 [2000]).
"[T]he primary task of statutory construction, as applied to the interpretation of the New York City Zoning Resolution and more specifically to the terms employed in section 12-10, is to give effect to the clear intent of the [legislative body]" (Matter of Mason v Department of Bldgs. of City of N.Y., 307 AD2d 94, 100 [1st Dept 2003], lv denied 1 NY3d 503 [2003]). In construing the language of the ZR, although we need not "unquestioningly defer to the administrative agency," we will give "due consideration to [the agency's] practical construction of the ordinance" (id.).
The majority reaches its result by claiming that the relevant regulations are unambiguous. Specifically, the majority claims that the provisions at issue clearly disallow the use of the "building-by-building" methodology employed by respondents to calculate the open space ratio for a zoning lot containing multiple buildings [FN2]. In other words, the majority finds that the various provisions, as amended in 2011, clearly prevent the DOB from crediting roof space on 808 Columbus's roof as part of the total required open space for the zoning lot.
Contrary to petitioners' contention, and the position of the majority, the provisions of the Zoning Resolution at issue here are not clear and unambiguous. As set forth below, ZR §§ 12-10, 23-14, 23-142 must all be read in conjunction with each other, and each given effect. Petitioners' claim that roof space on a residential building no longer counts as open space is [*15]based on a reading of these regulations that ignores key aspects of the definition of open space and the provisions' silence on zoning lots containing multiple buildings. Hence, BSA's interpretation of an ambiguous regulatory scheme is owed both due consideration and deference, and because the open space provisions are subject to different interpretations, it cannot be said that the BSA's resolution was irrational or arbitrary and capricious.
As Supreme Court noted, the 2011 Amendments undoubtedly clarified that the amount of required open space must be based on the zoning lot as a whole (see ZR §§ 23-14, 23-142). However, the 2011 Amendments left untouched the definition of "open space" in ZR § 12-10, and thus did not alter the inclusion of roof space as open space. Nor did they clarify how to calculate the required open space for a zoning lot containing multiple buildings.
Both in 2009 when the challenge was made to the 808 Columbus building, and in 2015 when the challenge was made to JHL's nursing home, ZR § 12-10 defined open space as that part of zoning lot which is "open and unobstructed from its lowest level to the sky and is accessible to and usable by by all persons occupying a dwelling unit or a rooming unit on the zoning lot."
However, at all times the ZR left intact that open space may be provided on a roof, including the roof of a community facility building and a building containing residences. It is obvious but must be stated that roofs on residential buildings are only accessible to those who live within such building.
In addition, ZR § 12-10 also includes "yards" and "courts" within the definition of open space. In this regard, it is notable that "courts" include "inner courts," which are defined elsewhere in the section as being bounded by building walls, or walls and lot lines. Presumably, some of these yards and courts may also be accessible only by residents of particular buildings on the lot.
It is also quite significant that both in 2009 and after the 2011 amendments the ZR did not address open space requirements for zoning lots containing multiple buildings. Respondents, who possess specialized expertise in interpreting the ZR, state that the drafters of the ZR in 1961 did not contemplate zoning lots with multiple parcels with separate owners. They also state that the 2011 amendments did not address the effects of the changes on open space requirements for these situations.
In other words, the unclear and conflicting language in ZR § 12-10 and the related provisions would not be consequential when there is a single residential building on a zoning lot, as all residents would have access to shared spaces, including roofs, yards, courts and the like. However, where, as here, there are multiple buildings under different ownership and control on a single zoning lot, ZR § 12-10 does not provide one clear answer.
Accordingly, given the ambiguous language in the section, the BSA rationally determined that the best practical reading of ZR § 12-10 when faced with multiple buildings under different ownership and control on a single zoning lot is to permit some open space to be reserved for residents of a single building, so long as the zoning lot as a whole has the minimum amount of open space required, and residents of each building on the lot have access to at least the amount of space that would be required if each building were on a separate lot. Indeed, in these situations it would not be feasible to make all the open space on a zoning lot accessible to and usable by all residents of each building on the zoning lot. The interpretation by BSA gives effect to both the zoning lot based open space requirements under ZR §§ 23-14, 23-142, and to the inclusion of roofs, courts, and yards within the definition of open space under ZR § 12-10 (see see Matter of Shannon, 25 NY3d 345, 351 [2015] [statute "must be construed as a whole" and its "various sections must be considered together and with reference to each other"] [internal quotation marks and citations omitted]). Thus, it cannot be said that BSA's determination was irrational, and we should defer to the agency's practical construction of the ordinance (see Mason, 307 AD2d at 100-101).
Despite the clear ambiguity among the relevant regulations, and the requisite deference that should be afforded BSA's interpretation of them, the majority somehow ignores the discrepancies, conflicts and silence presented by the sections when read in conjunction with each other, and when each part is given meaning. Instead, the majority focuses only on the amended language which replaced the term "building" with "zoning lot" to conclude that on a multi-building zoning lot the open space ratio cannot be calculated on a building-by-building basis.
In this regard, the majority agrees with petitioners that the 2011 amendments foreclosed a reading of these interconnected regulations that would permit some open space on a multi-building zoning lot to not be accessible to all residents of such a zoning lot. Accordingly, the majority concludes that the open space on 808 Columbus's roof cannot be included in the calculations of the minimum open space required for the zoning lot in connection with the present project because it is only accessible to the residents of 808 Columbus.
However, the majority's reading of these regulations as "clear and unambiguous" and their description of the task at hand as "pure statutory interpretation" with no need to give deference to BSA's knowledge and expertise is erroneous. Indeed, the majority concedes, as it must, the "impracticality of allowing the residents of one building on a zoning lot to have access to, and use of, open space located on the rooftop of another building on the zoning lot."
Yet, to support its forced reading of an ambiguous set of regulations, the majority focuses on the portion of ZR § 12-10 defining "open space" as being "accessible to and usable by all persons occupying a dwelling unit or a rooming unit on the zoning lot." Notably, although the City Planning Commission was aware of BSA's interpretation of open space in the 2009 Resolution, no changes were made to the definition of open space. In fact, the definition of open space was unchanged for more than five decades for zoning lots owned and controlled by a single owner. At the same time, the majority overlooks the conflicting portion of the same section, which was not amended in 2011, and which provides that open space may include areas covered by roofs. Thus, the majority reads one portion of the section to the exclusion of the other to reach its result.
The majority's reading of that portion of ZR § 12-10 (prior to the 2011 amendments) that requires open space to be accessible to and usable by all persons occupying a dwelling unit on a zoning lot disregards the history and context of the ZR at the time it was drafted in 1961. To reiterate, at that time a zoning lot was necessarily controlled by one owner who would provide the necessary open space, and the 1961 ZR never considered the possibility of a zoning lot made up of different parcels controlled by different ownership. Thus, it is simply incorrect for the majority to state that the language under ZR § 12-10, which remains unchanged since 1961, unambiguously requires open space to be available to "all residents of any residential building on the zoning lot, not only the building containing the open space in question."
The majority also finds that ZR § 12-10 unambiguously requires that any rooftop space must be accessible and usable by all residents on a zoning lot by referencing language in the section that states: "All such roof areas used for open space shall meet the requirements set forth in this definition." But, this does not and cannot be applied to the problem that faces us here, namely, multi-building zoning lots, in which residents of one building could not access the roof of a neighboring building on the same lot. Once again, even the majority can see the impracticality of such a requirement.
When read properly, it is clear that ZR § 12-10 both contains internal inconsistencies and is ambiguous when read in conjunction with ZR § 23-14 and ZR § 23-142. This is precisely why we must defer to the BSA's expertise and rational interpretation of these regulations.
It is also noted that as a community facility the nursing home was specifically permitted by ZR § 12-10 to provide open space on a roof, and was not required to provide any additional open space on the zoning lot, particularly since it would not disturb the overall open space on the [*16]lot, which was already determined by BSA to be in compliance with the ZR.
Respondents also point out that at the time of the 2011 Amendments CPC was presumed to be aware of BSA's 2009 Resolution interpreting the definition of open space in the cases of multiple buildings on one zoning lot (see Community Bd. 7 of Borough of Manhattan v Schaffer, 84 NY2d 148, 158 [1994][legislature is presumed to be familiar with agency decisional law]; 2 RCNY 1-06.4[a][party appealing to BSA from an interpretation of the ZR must forward copies of application materials to the CPC's legal counsel]). Thus, the CPC's choice not to alter the language of ZR § 12-10 suggests legislative approval of the BSA's construction of open space (Community Bd. 7, 84 NY2d at 159).
The majority also sidesteps respondents' valid point about the legislative history. Instead, the majority insists that the statute is clear and unambiguous and that therefore it can glean the legislature's intent. Yet, the fact remains that the legislative history related to the 2011 amendments is relevant since the amendments did not alter the definition of "open space" in ZR § 12-10, in particular the inclusion of roof space as open space, and did not provide how to calculate the required open space for a zoning lot containing multiple buildings. Thus, it is impossible to say that either the statutory language or the legislature's intent is clear and unambiguous.
Nor is there anything to support the majority's view that the legislature "unmistakabl[y] reject[ed]" the "utilization of a building-by-building formula in calculating the open space ratio for a multiple building zoning lot." Had the legislature desired to make such a straightforward rejection of the BSA's 2009 methodology it could have explicitly provided for that in the amended version of the regulations. Yet, it chose not to do so.
In sum, Supreme Court correctly found the provisions of the ZR are susceptible to conflicting interpretations, and properly deferred to the BSA's practical and rational interpretation of the definition of open space (see Matter of Chin v New York City Bd. of Stds. & Appeals, 97 AD3d 485, 487 [1st Dept 2012], lv denied 19 NY3d 815 [2012]). I would therefore affirm Supreme Court's judgment.
Judgment (denominated decision/order), Supreme Court, New York County (Joan Lobis, J.), entered August 9, 2016, reversed, on the law, without costs, and the petition granted to the extent of annulling the resolution and denying the permit.
Opinion by Oing, J. All concur except Tom, J. who dissents in an Opinion.
Renwick, J.P., Tom, Webber, Oing, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: OCTOBER 16, 2018
CLERK



Footnotes

Footnote 1:Petitioner Maggi Peyton, the sole original party who commenced this proceeding, passed away on October 26, 2016 while this appeal was pending. By order, entered April 6, 2017, this Court permitted her son, Randy Peyton, to continue to maintain this proceeding on behalf of the Estate of Maggi Peyton. By the same order, this Court also permitted additional petitioners, who are Park West Village residents and are members of the Park West Village Tenants Association, to intervene in this instant appeal.

Footnote 2:Park West Village also includes a second "superblock" that is bounded by 97th and 100th Streets, and Columbus Avenue and Central Park West. This superblock is not implicated in this appeal. 

Footnote 3:With respect to the relevant open space square feet measurements, the record demonstrates that there are several discrepancies. The difference in all of the relevant measurements is de minimis and does not affect the resolution of the issues in this appeal.

Footnote 4:Hashtag indicates a defined term in the Zoning Resolution.

Footnote 5:For example, ZR § 12-10 defines the " open space ratio' of a #zoning lot# [as] the number of square feet of #open space# on the #zoning lot#, expressed as a percentage of the #floor area# on that #zoning lot#. (For example, if for a particular #building zoning lot# an #open space ratio# of 20 is required, 20,000 square feet of #floor area# in the #building# would necessitate 4,000 square feet of #open space# on the #zoning lot# upon which the #building# stands; or, if 6,000 square feet of #lot area# were in #open space#, 30,000 square feet of #floor area# could be in the #building# on that #zoning lot#)."
ZR §§ 23-14 and 23-142, which set forth the minimum requirement for open space, were amended to remove the words "building on a," leaving just the words "zoning lot." Thus, ZR § 23-14 was amended to provide "[i]n all districts, as indicated, ... for any #building# on a #zoning lot#, the minimum required #open space# or #open space ratio# shall not be less than set forth in this Section ...." And, ZR § 23-142 was amended to read: "in the districts indicated, the minimum required #open space ratio# and the maximum #floor area ratio# for any #building# on a #zoning lot# shall be as set forth in the following table for #buildings# #zoning lots# with the #height factor# indicated in the table."

Footnote 6:618 square feet open space excess calculation:2009 Resolution
Zoning Lot: 240,331 sf
Required Minimum Open Space:230,108 sfOpen Space Excess: 10,223 sf2015 Resolution
JHL building use of
Parking Lot Open Space: 20,036 sf
Roofed Garden Open Space: 10,431 sfOpen Space Loss: 9,605 sf
Zoning Lot Open Space: 230,726 sf
Required Minimum Open Space:230,108 sfOpen Space Excess - Open Space Loss =
Remaining Open Space Excess 618 sf

Footnote 7:In their arguments, respondents often make reference to multiple buildings under multiple ownership or control. This issue was the result of the 1977 fundamental change to the zoning lot definition. In this dispute and the 808 Columbus proceeding, DOB and BSA did not address the issue of ownership. Thus, any distinction that can be drawn between single owner zoning lot and multiple owner zoning lot is a distinction without a difference. DOB and BSA took the view that application of the building-by-building approach would be used in addressing multiple buildings on a single zoning lot.

Footnote 8:Petitioners' reliance on a DOB decision concerning 144 North Street in Brooklyn to suggest otherwise is unavailing. The issue there was whether DOB should have required a written easement agreement in favor of residents of a new building under construction on the same lot or whether DOB could rely on its examination of the building plans to satisfy itself that access would be provided. That determination did not consider the issue of whether on a multi-building zoning lot there are circumstances under which qualifying open space can be reserved for residents of only one building.

Footnote 9:Petitioners' challenge to the building-by-building methodology of open space as being inconsistent with the formula to calculate allowable amount of roofed open space (the 10% rule) is a claim not pleaded in the verified petition or argued before Supreme Court, and raised for the first time on appeal. As such, the argument is not reviewable (see U.S. Bank Natl. Assn. v Beymer, 161 AD3d 543 [1st Dept 2018]).

Footnote 1:Significantly, as the majority recognizes, the 1961 ZR provided that a zoning lot could "only consist of land that was entirely under the control of a single owner or a long-term lease," and it assumed that "a single owner, who controls the entire zoning lot, would be capable of providing open space to the entire zoning lot." As the majority also concedes, the 1961 ZR did not "contemplate the possibility that a zoning lot could consist of multiple parcels under different ownership and control, with each parcel subject to its own unique conditions governing open space access."

Footnote 2:This methodology merely entails ensuring that the residents of each building on the zoning lot have access to the open space they would be entitled to if each building were on its own zoning lot.